United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBERT GORDON,<br><br>       Plaintiff,<br><br>    v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>       Defendant. | Case No.  5:10-cv-05399-EJD<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 62, 64 |

## I.  INTRODUCTION

In this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et seq. ("ERISA"), Plaintiff Robert Gordon ("Plaintiff") seeks long term disability benefits from Defendant Metropolitan Life Insurance Company ("Defendant").  Presently before the Court are the parties' competing motions for summary judgment.  The Court finds it appropriate to take the motions under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment.

## II.  BACKGROUND

Plaintiff worked as a Senior Staff Systems Programmer with Ashton-Tate starting in 1989. In 1991, Ashton-Tate was purchased by Borland Software ("Borland") and Plaintiff worked for

Borland until May 1, 2002.  As a Borland employee, Plaintiff was eligible for LTD benefits through the Borland Software Corporation LTD Plan ("the Plan"), which is governed by ERISA. Defendant MetLife funded LTD benefits under the Plan and was also the claim administrator for the LTD claims.  The Plan includes the following definition of "Disability," subject to all other Plan terms and conditions:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.      during your Elimination Period and the next 60 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2.      after the 60 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

Administrative Record ("AR") at 001470.  The Plan contains the following limitation for disabilities due to a mental or nervous disorder or disease:

> **Limitation For Disabilities Due to Particular Conditions**
>
> Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a Mental or Nervous Disorder or Disease, unless the Disability results from:
>
> 1. schizophrenia;
> 2. bipolar disorder;
> 3. dementia; or
> 4. organic brain disease.
>
> "Mental or Nervous Disorder or Disease" means a medical condition of sufficient severity to meet the diagnostic criteria established in the current Diagnostic And Statistical Manual of Mental Disorders. You must be receiving Appropriate Care and Treatment for your condition by a mental health Doctor.

Case No.: 5:10-cv-05399-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

2

AR at 001485.

On or about April 19, 2002, Plaintiff commenced a period of short term disability. He returned to work on May 1, 2002, but was terminated that same day due to performance issues and his behavior at a meeting with Human Resources about his performance issues. MetLife AR at 001412-13.

On October 22, 2009, seven years after Plaintiff allegedly became disabled, Plaintiff submitted a claim for LTD benefits for a disability beginning April 19, 2002. AR at 001440. He indicated on the claim form that he suffered from the following conditions that prevented him from performing his job: arthritis in the spine and joints; severe insomnia; collapsed thoracic vertebra; very large spinal osteophytes; herniated vertebral discs; severe cervical foraminal stenosis; depression; chronically active viruses; anxiety; ADD; heart palpitations; impaired short-term memory; migraine headaches; chronic system inflammation; left knee surgery; cervical spine surgery; left shoulder surgery; Apico/jaw surgery; sinus surgery; thoracic and lumbar disc disease; chronic esophagitis; and chronic sinusitis. AR at 001440-41. Accompanying Plaintiff's claim form was a note from his treating physician, Dr. Resneck-Sannes, dated October 15, 2009, which indicated that the most recent date of treatment was October 15, 2009, and stated that Plaintiff had "disabling back & neck pain for degenerative disc disease," "chronic migraine headaches," and "failed knee and shoulder surgery" since February of 2002. Id.

In May of 2010, Defendant notified Plaintiff that it lacked "required Employer information to complete the initial review" of Plaintiff's claim. AR at 001079. More specifically, Defendant stated that it lacked verification from Borland that Plaintiff was eligible for LTD coverage. Defendant further indicated that Plaintiff's claim would be closed until it received the employer verification, but also stated Plaintiff could appeal the decision because the claim "was denied in whole or in part." AR at 001080. Plaintiff appealed Defendant's decision (AR at 001053), and initiated this action on November 29, 2010. See Compl., Docket Item No. 1.

Pursuant to stipulation, the instant action was stayed while Defendant resolved Plaintiff's

appeal. On March 30, 2012, Defendant determined that Plaintiff had coverage under the Borland Plan through May 1, 2002. AR at 000947. A few days later, Plaintiff faxed to Defendant certain forms Defendant required to determine his eligibility for benefits. AR at 000961.

On December 7, 2012, Defendant notified Plaintiff his LTD claim was denied because the information in the claim file did not support a finding of disability within the meaning of the Plan. AR at 000776. On May 7, 2013, Plaintiff appealed Defendant's decision. Defendant has not issued a formal decision on Plaintiff's appeal.

The court lifted the stay and restored this case to active litigation on January 2, 2015. See Docket Item No. 48. By Order dated April 29, 2015, this Court determined that Defendant's benefit decision is subject to review under an abuse of discretion standard. See Order Denying Plaintiff's Motion for Summary Adjudication. This Court noted, however, that procedural violations of ERISA's requirements are evidence of arbitrary and capricious decision making. Id. at 7:26-8:3 (citing Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005) and Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 972 (9th Cir. 2006) ("A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion.")). The Court also advised the parties that it would conduct a review of Defendant's benefit decision "with a heightened degree of skepticism and will consider additional evidence submitted with Plaintiff's notice of appeal." Id. at 8:4-6. (citing Hinz v. Hewlett Packard Co. Disability Plan, No. 10-CV-03633-LHK, 2011 U.S. Dist. LEXIS 386454, at *24 (N.D. Cal. March 30, 2011).

Plaintiff now moves for summary judgment, contending that he has been disabled within the meaning of the Plan since he stopped working on April 19, 2002. Defendant opposes Plaintiff's motion for summary judgment and also moves for summary judgment in its favor, contending that its determination was reasonable, supported by the evidence, and not an abuse of discretion.

### III. STANDARDS

Ordinarily, a motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed.R.Civ.P. 56(c); Celotex, 477 U.S. at 324. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

### A. Standard of Review

Under the abuse of discretion standard of review, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" Day v. AT&T Disability Income Plan, 698 F.3d 1091, 1096 (9th Cir. 2012) (citing Conkright v. Frommert, 559 U.S. 506 (2010)). The test for abuse of discretion in a factual determination is whether "we are left with a definite and firm conviction that a mistake has been committed," and the court "may not merely substitute [its] view for that of the fact finder." Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011), citing United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009). "To do so, we consider whether application of a correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. at 676.

### B. Defendant's Benefit Determination Was Not Unreasonable

The Administrative record shows that Plaintiff suffered mentally and emotionally as of April 19, 2002, and there is evidence that Plaintiff's condition was directly related to issues at his workplace and with his supervisor. There is also evidence that Plaintiff suffered from chronic

pain.  The issue before the court, however, is not whether Plaintiff suffered from these medical challenges.  Instead, the proper inquiry is whether Defendant's disability determination was reasonable.  Day, supra.

The Administrative Record contains conflicting medical opinions regarding whether Plaintiff's mental condition and chronic pain rendered Plaintiff disabled within the meaning of the Plan as of April 19, 2002.  Nevertheless, Defendant's determination that Plaintiff was not "disabled" within the meaning of the Plan cannot be characterized as illogical, implausible or without support in inferences that may be drawn from the record.

### 1.  Defendant's Medical Reviewers Conducted a Thorough Review of Plaintiff's Record

Defendant's medical reviewers conducted a lengthy and thorough review of Plaintiff's records.  These records confirm that Plaintiff suffered from multiple medical conditions as of April 19, 2002.  A diagnosis alone, however, does not necessarily establish a disability.  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 63 F.Supp.2d 1145, 1157 (C.D. Cal. 1999), aff'd 370 F.3d 8699 (9th Cir. 2004), disapproved on other grounds, Montour v. Hartford Life and Acc. Ins. Co., 588 F.3d 623 (9th Cir. 2009).

### Dr. Koopman's Assessment in April of 2002

Included in the Administrative Record is an April 19, 2002 workers' compensation report by Dr. Jane Koopman with the Santa Cruz Medical Clinic.  AR at 001111-12.  Dr. Koopman described Plaintiff as "a 49-year old staff systems programmer at Borland who presents complaining of emotional distress" arising out of Plaintiff's working conditions and a hostile supervisor.  AR at 001111.  Specifically, Dr. Koopman's notes included the following description of Plaintiff's work conditions:

> History here is that there have been some changes of personnel over the last nine months at his work.  This has placed a great deal of stress on his boss who has been passing some of this on to the patient.  He has been threatening to fire him and berating him in public.  He has been given contradictory orders.  The patient has complained to Human Resources three times in the past couple of months.  Yesterday, there was an episode where his boss accused

> him of mismanaging a project that was not even his. The patient
> turned around and walked away. His boss approached him in such a
> manner, that he actually felt physically threatened. There was no
> altercation, but shortly afterward the patient felt quite nauseated
> with his heart racing, sweating and went and informed his employer
> that he was leaving work for the day.

AR at 001111. Dr. Koopman noted that Plaintiff was taking blood pressure medication, Ativan and Topamax; that he was having difficulty falling asleep and waking up; that he has been having trouble concentrating and difficulty with his memory; that he reported feeling depressed; and that "heart racing episodes" have been occurring for several days, but these episodes do not involve shortness of breath, chest pain or nausea. AR at 001111-12. Dr. Koopman observed that Plaintiff initially had difficulty even starting to speak and appeared very stressed. Dr. Koopman's assessment was that Plaintiff had "1. Stress reaction with both anxiety and depressive features. 2. hypertension. 3. Complaints of palpitations-probably part of his anxiety but would like to rule out arrhythmia." AR at 001112. Testing later confirmed that Plaintiff had no heart condition. AR at 001118.

According to a Doctor's First Report of "Occupational Injury or Illness" dated April 22, 2002, Plaintiff reported to Dr. Koopman that constant threats and harassment from his boss caused him to feel faint and nauseated, and to suffer elevated blood pressure, rapid heartbeat and sweating. AR at 001132. On April 26, 2002, Plaintiff had a follow up visit with Dr. Koopman. The notes of the visit indicate that a Worker's Compensation attorney recommended that Plaintiff return to work if he could be transferred to another department, and that Plaintiff planned to return to work the following Monday. Dr. Koopman's assessment was that Plaintiff had: "1. Stress reaction with both anxiety and depressive features. 2. Hypertension in good control today. 3. History of palpitations; pending Holter results." AR at 001113.

### Dr. Zweng's 2002 Assessment

On April 29, 2002, Plaintiff was seen by Dr. Dean G. Zweng at the Santa Cruz Medical Clinic, who noted the following:

> A 49-year old who has been off work due to anxiety and job stress.

Case No.: 5:10-cv-05399-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

He feels like he needs to get back to work, although it does not feel too much better. He did meet with his employers and some initial changes were made to decrease his level of stress at work. On further questioning, he has had some chronic feelings of irritability and inability to make decisions, sleep disturbance, anxiety and agitation. In low mood and tearfulness. He has a bedridden daughter for four years at home and a history of depression. He has been on different anti-depressant medications in the past mainly to control his chronic pain issues of his neck and back. He was able to tolerate Paxil in the past; however, it did not help his chronic pain. He has also been on Celexa recently which caused him too much agitation, and he could not tolerate Zoloft or try a cycle of antidepressants. He also has a history of hypertension.

AR at 001116. Dr. Zweng's assessment was that Plaintiff had "[a]djustment reaction with anxiety and depression with probably underlying major depression." Id. Dr. Zweng released Plaintiff to return to work. Id.

<u>Dr. Mears' 2002 Assessment</u>

On May 1, 2002, Plaintiff was seen by Dr. William C. Mears at the Santa Cruz Medical Clinic. Dr. Mears noted that Plaintiff "continues with anxiety, rapid heartbeat, unable to sleep. . . . Also increased anxiety at work. He said that he was suspended today." AR at 001119. Dr. Mears' assessment was that Plaintiff had: "1. Palpitations; work-up in progress. 1. Adjustment disorder with anxiety and depression related to job stressors. 3. Insomnia, possibly related to his Paxil." Id.

<u>Dr. Koopman's May 4, 2002 Assessment</u>

Plaintiff was seen for the third time by Dr. Koopman on May 4, 2002. The notes from this visit describe the following:

[Plaintiff] returns today complaining of diarrhea. He is uncertain whether this is a side effect of some of the medications he has been placed on or of another etiology. Since I last saw him on 4/26, patient returned to work the following Monday which would have been 4/29. I had given a note saying he was okay to return to work as long as he was in a different department than his usual one. He reports that he was told by his Human Resources person there that that was not acceptable and that he had to go back and see the doctor and get a note saying that he was okay to go back to his usual work. Apparently, he saw Dr. Zweng here who put him on Paxil and did send him off with a note saying he was okay to return to his usual

duties. He went to work the following day on 4/30 and was told he was suspended. He was having a great deal of difficulty sleeping at night and was seen the following day on Wednesday, 5/1, by Dr. Mears who suggested he take the Paxil in the a.m. and also gave him Clonazepan to take a bedtime. He was wearing the Holter monitor that had been arranged for the palpitations he has been having the whole of Tuesday and reports that his heart did seem like it was racing at times during then so presumably we would have caught anything that was there. He then received a letter from his employer Thursday, 5/2, saying that he had been fired. . . .

AR at 001122. Dr. Koopman's assessment was that Plaintiff suffered from anxiety/depression and diarrhea.

### Dr. Mears' May 2002 Assessment

Plaintiff returned to Dr. Mears on May 11, 2002, at which time Dr. Mears noted that Plaintiff's palpitations seem to be better; that Plaintiff was suffering from diarrhea; and that Plaintiff's "stress has increased" and that he "is still feeling as anxious and depressed as he was before." AR at 001126. Dr. Mears made the following assessment: "1. Palpitations; improved on Tenormin. 2. Diarrhea, possibly secondary to the Tenormin (Atenolol) versus secondary to Blastocystis. 3. Adjustment disorder, anxiety and depression due to job stress." Id.

### Dr. Meade's March 2003 Assessment

In a March 21, 2003 Workers' Compensation Report, Dr. Michael G. Meade summarized Plaintiff's history (as told by Plaintiff) as follows. Plaintiff was hired at Ashton-Tate through a vocational rehabilitation program after a back injury. AR at 001146. Plaintiff was happy working as a systems software worker until 2000, when a new CEO was hired. Id. Plaintiff felt overwhelmed, and his supervisor began harassing him on a daily basis, demanding that Plaintiff work faster. Id. When asked about non-industrial stressors, Plaintiff told Dr. Meade that he was taking care of his ill 18 year-old daughter, who had been bedridden for the past ten years. Id. Plaintiff told Dr. Meade that caring for his daughter was stressful, but that "the stress has been present for five years with no sign of disability proceeding from it." Id. Dr. Meade also noted that Plaintiff "denies other medical, relationship, family, legal and financial problems." Id.

Dr. Meade opined that Plaintiff was "suffering from an episode of major depression, which

is of severe nature, and is characterized by serious generalized anxiety and discrete panic attacks." AR at 001155. Further, Dr. Meade opined that Plaintiff's depression "is superimposed on an underlying dysthymia, and chronic, probable lifelong Attention Deficit Hyperactivity Disorder." Id. Dr. Meade also stated: that "[t]here is ample medical evidence on today's examination to establish that the patient is currently temporarily totally disabled on a psychiatric basis"; that Plaintiff "is not permanent and stationary with respect to his mental illness"; and that "it is quite clear from the history and the medical records that this depression developed in response to industrially related stress, namely the harassment and threatening of the patient by his immediate supervisor, leading ultimately to the disciplinary action of May 2002, the proximate cause of his abrupt termination May 1, 2002." AR at 001155-56.

<u>Assessments re Neck and Back Pain from 2003</u>

In August of 2003, Plaintiff was evaluated by Dr. Michael D. Butcher for multiple musculoskeletal complaints including in the following order of severity: neck pain, upper back pain, shoulder pain, left knee pain and hip pain. Dr. Butcher determined that Plaintiff appeared to have stiffness and limited range of motion in the neck and back, and swelling in the left knee. AR at 001159. Plaintiff had MRIs taken of his spine, left and right shoulders, and left knee. On August 29, 2003, Dr. Samir Sharma reported that the MRI of the cervical spine showed cervical spondylosis markedly at C5-6 with disc involvement and root involvement at the C5-6 level. On the lumbosacral MRI, Dr. Sharma saw evidence of lumbar stenosis, particularly at L4-5 and L3-4 levels. AR at 001180.

Included in the Administrative Record is a "To Whom It May Concern" letter written by Dr. Butcher dated September 17, 2003, in which Dr. Butcher opined that Plaintiff is unable to work due to multiple musculoskeletal problems, including degenerative disc disease of the neck and lower back, arthritis in the right shoulder and torn cartilage in the left knee. AR at 001193. On October 28, 2003, Dr. Butcher prepared another report in which he opined again that Plaintiff was disabled from gainful employment. AR at 001198. There is also a letter dated November 14,

2003 from Dr. Rosemaria Gennuso to Dr. Butcher, stating that Plaintiff had "neck pain notable in all directions, worse with extension." AR at 001201. Dr. Gennuso noted, however, that although Plaintiff has had longstanding trouble with his neck, Plaintiff had no treatment for his neck for the past eighteen months. AR at 001200.

### Dr. Summa's Evaluations from 2010 and 2012

Included in the Administrative Record are two evaluations by Dr. Chris Summa, a spinal and orthopedic surgeon. The New Patient Evaluation dated September 2, 2010 stated that Plaintiff suffered a severe cycling accident approximately 20 years ago in which he fell off a cliff, and that Plaintiff had back pain for many years. AR at 000807. Plaintiff reported that his back pain worsened over the last five years, and that he could not stand or sit for very long, and that his daily activities, such as washing dishes and doing laundry, had become difficult. Id. Plaintiff had not had any back surgeries, although he did undergo a foraminotomy of the cervical spine in 2004. Id. Plaintiff also reported that he had numerous nerve blocks, medications, physical therapy, traction, chiropractic and acupuncture treatment. Id. Dr. Summa's medical impression was that Plaintiff had a T7-T8 disc herniation with thoracic degenerative disc disease. Id.

Plaintiff returned to Dr. Summa on May 31, 2012. Dr. Summa reported that Plaintiff was experiencing worsening difficulties with sitting and standing despite eighteen sessions of "Rolfing." AR at 000810. Dr. Summa's medical impression was that Plaintiff had L3-L4 and L4-L5 advanced degenerative disc disease. Id. Dr. Summa recommended fusion surgery, but Plaintiff was opposed to surgery.

### 2. Independent Physician Consultants Concluded Plaintiff Was Not Disabled

Defendant retained three Independent Physician Consultants ("IPC"), Dr. Lee Becker, Dr. Sugerman and Dr. Jane St. Clair, to review Plaintiff's medical records. Each of the consultants concluded that Plaintiff was not disabled within the meaning of the Plan.

### Assessments of IPC Dr. Lee Becker

On July 3, 2012, Defendant obtained a review from Dr. Lee Becker, a Board-certified

psychiatrist. AR at 00935-945. Dr. Becker summarized Plaintiff's medical records, and opined that "[o]verall, the information available to review did not support significant, global psychiatric functional limitations, along with objective findings, to preclude full-time occupational functioning from the date in question forward on an ongoing basis." AR at 000942.

Dr. Becker's IPC report was sent to Dr. Andrew Abarbanel, one of Plaintiff's treating psychiatrists. Dr. Abarbanel described Dr. Becker's report as accurate, and acknowledged that Plaintiff's difficulties were largely the result of workplace mistreatment. Dr. Abarbanel, however, opined that "the nature of the psychiatric injuries resulting from the abusive treatment make it very likely, in my estimation, that [Plaintiff] sustained an ongoing disability." AR at 00874. Dr. Abarbanel reasoned as follows:

> Specifically, his mood disorder (by my thinking best diagnosed as Major Depressive Disorder, Recurrent, 296.32) and his anxiety disorder (by my thinking best diagnosed as an anxiety disorder with post-traumatic features, 300.00). The former disorder is an ongoing disorder that, once exacerbated as it was, makes it much more likely for it to persist. The latter, almost by definition of the post-traumatic features tend to persist . . .

> My point, then, is that the reports establish the effects, industrially caused, the company's actions precipitated are by their nature very likely to persist. That fact, plus the fact that Mr. Gordon is now ten years older and about to turn 60, make it very likely that a significant degree of disability would be identified if he is examined currently. I would very much recommend that examination now if you intend to establish ongoing disability.

AR at 000874-75.

On October 9, 2012, Dr. Becker prepared an addendum to his initial report to discuss Dr. Abarbanel's letter. Dr. Becker determined that the additional information from Dr. Abarbanel did not impact the initial report, stating:

> The psychiatric response letter indicates no major issues with the psychiatric consultant report findings. The letter clarifies the clinician's working diagnoses, as well as describing causative factors contributing, which have been previously noted. The clinician speculates on disability status. However, no additional psychiatric clinical information was provided for review, such as additional detailed objective mental health findings, progress notes, or psychological testing and ongoing treatment by the psychiatrist

was not described.

AR at 000797.

<u>Assessments of IPC Dr. Sugerman</u>

After Plaintiff filed an appeal, Defendant retained Dr. Peter Sugerman, a Board-certified psychiatrist, to prepare an IPC report dated July 16, 2013. Dr. Sugerman determined that there was insufficient evidence of a psychiatric functional impairment. AR at 671. In an addendum dated January 28, 2014, Dr. Sugerman reiterated his original opinion that from the outset, Plaintiff's condition was viewed as chronic and reflective of situational factors, but not of such a severity that required intensive treatment. AR at 000581-82. In another addendum dated March 14, 2014, Dr. Sugerman considered additional information submitted by Dr. Abarbanel, but concluded that the new information amounted to opinion only, without detailed, objective, global mental health data. AR at 000552 . Dr. Sugerman prepared another addendum dated August 18, 2014, in which he confirmed his prior assessment. AR at 000359-364.

<u>Assessments of IPC Dr. Jane St. Clair</u>

On August 2, 2013, Dr. Jane St. Clair prepared an IPC report. Dr. St. Clair, who is Board-certified in Occupational Medicine, focused her review on Plaintiff's alleged shoulder, knee and spinal impairments. Dr. St. Clair concluded that there was no documentation to show that Plaintiff's musculoskeletal complaints existed with such severity as to cause restrictions and limitations on April 19, 2002. AR at 675-683.

After speaking to Plaintiff's physician, Dr. Resneck-Sannes, Dr. St. Clair prepared an addendum dated August 25, 2013. AR at 655-656. According to the addendum, Dr. Resneck-Sannes told Dr. Clair that Plaintiff had had various musculoskeletal complaints for as long as he had known Plaintiff, and confirmed that he did not have any records for April through December of 2002. Plaintiff was seen by Dr. Resneck-Sannes on February 5, 2002, and again on June 23, 2003: there are no records of Plaintiff having been seen by Dr. Resneck-Sannes between February 2002 and June 2003. AR at 00656. Dr. St. Clair prepared additional addendums dated January

United States District Court
Northern District of California

28, 2014 (AR at 000592-93), March 22, 2014 (AR at 000564-567), and June 29, 2014 (AR at 000390-92).

In light of the assessments prepared by Dr. Becker, Dr. Sugerman and Dr. St. Clair, Defendant could reasonably conclude that despite Plaintiff's medical ailments, he could perform his Own Occupation for a different employer.

### 3. Plaintiff Has Not Shown that Defendant's Disability Determination is Unreasonable

To substantiate his claim of disability, Plaintiff relies on, among other things, the opinion of Dr. Steven Padgitt dated December 9, 2002, approximately six months after Plaintiff's termination, which stated:

> This is to verify that I have begun a course of treatment with Robert Gordon. The patient reports a long-standing history of attention/concentration (Attention Deficit Disorder) problems. It is also clear from his historical report that he suffers from Post Traumatic Stress Disorder, an anxiety disorder resulting from environmental stress/trauma. The PTSD symptoms are exacerbating his attention and concentration difficulties. This disorder appears related to his work conditions under the employ of Borland Software Corporation.

> He was assessed using Quantitative EEG technology and showed abnormalities when compared to his asymptomatic peers. We are treating predominantly with a course of EEG Biofeedback.

AR at 000713. Plaintiff also relies on a psychiatric evaluation of Dr. Michael Meade stating that Plaintiff was temporarily totally disabled on a psychiatric basis. AR at 001155. These diagnoses alone, however, do not necessarily establish eligibility for benefits. See e.g. Jordan, supra; Martin v. Continental Cas. Co., 96 F.Supp.2d 983, 994 (N.D. Cal. 2000); Hoskins v. Bayer Corp. and Business Serv. Long Term Disability Plan, 564 F.Supp.2d 1097, 1107 (N.D. Cal. 2008).

Furthermore, Dr. Becker considered both Dr. Padgitt's and Dr. Meade's opinions and set forth several reasonable bases to support his conclusion that Plaintiff was not disabled under the Plan. Among other things, Dr. Becker noted that Plaintiff was able to attend to his chronically bedridden child and spent time writing software, playing on his computer, reading, and attending to various household chores. AR at 000943. Dr. Becker also noted that the "[m]ental status

examination findings showed no significant lability or agitation, speech within normal limits, and no significant abnormalities in thought processing, or reality testing, immediate or remote recall, abstraction, intellect, or insight and judgment." AR at 000943-44. Dr. Becker' report stated that "[m]ild decrease in recent recall was noted and difficulties with calculations noted." AR at 000944. Dr. Becker, however, determined that "there was no indication that additional psychological or neuropsychological testing was pursued to further assess cognitive and executive functioning. Furthermore, the GAF score was noted to be 61 with the highest in the past year of 81, which did not appear to be supportive of continuous, severe regression in daily functioning." Id. Dr. Becker also noted that Plaintiff was "able to attend to his own needs, household needs, the needs of a chronically ill family member, and there was no indication that the [Plaintiff] required significant personal assistance from others, which would be typically seen in individuals with severely impairing psychiatric conditions." AR at 000944. Further, from 2003 forward, there was no indication of ongoing, intensive mental health treatment. Id.

Dr. Becker's addendum also sets forth an additional reasonable basis for rejecting Plaintiff's claim of disability based on a psychiatric condition. Specifically, Dr. Becker stated that the documentation Plaintiff submitted after Dr. Becker's initial review did not contain any additional psychiatric clinical information, such as additional detailed objective mental health findings, progress notes or psychological testing and ongoing treatment by the psychiatrist. AR at 000796.

Plaintiff next takes issue with Dr. Sugerman's report dated July 16, 2013, and contends that the report should be disregarded because Dr. Sugerman "exclude[d] the concept of psychological injury due to a work situation." AR at 00604. Dr. Sugerman, however, explained his analysis and reasoning on this point as follows:

> Comments by this reviewer about these data exclude the concept of psychological injury due to a work situation. This topic was probably addressed by those who helped the claimant pursue worker's compensation and is not germane to this report, which addresses whether evidence of impairment due to a psychiatric

illness.  For the purposes of this report, stress it not an illness.  It is a condition of life.  Responses to stress are therefore not considered symptoms of illness unless it can be demonstrated that the claimant's psychological condition developed into a psychiatric illness.  Stress is mentioned repeatedly in this file, referring to the claimant's work situation, illness in his daughter, and financial difficulties.

It is my opinion, after reviewing available data, that symptoms do not support a severe psychiatric condition that would require psychiatric limitations or restrictions. From the outset, the claimant's condition was viewed as somewhat chronic in nature, reflective of situational factors, and not of such severity that intensive care was required.  Objective abnormalities are not reflective of impairment by documenting severe abnormalities. Complaints of cognitive difficulties are complicated by an ongoing diagnosis of attention deficit disorder, a chronic disorder that may alter a mental status exam on an ongoing basis, and often individuals compensate for such abnormalities.  Thus, a singular abnormality by Dr. Meade, who tested serial sevens and spelling world [sic] backwards (considered a crude mental status test), is difficult to generalize to the level of impariment [sic].  Furthermore, linking cognitive states to a psychiatric condition is not a simple equation, since many factors can impact cognition.

The file does not argue for a severe psychiatric condition that would support psychiatric limitations by linking symptoms to a decline in global functional difficulties.  For exam, Dr. Meade noted on 3/21/03 that the claimant was able to care for his daughter, perform household chores, or work on computer programs, which tends to argue against the presence of significant psychiatric impairment rather than for disability as he concluded.  Other mental health notes do not comment on the claimant's functional abilities and therefore do not support impairment through this method.

The file does not include explicit evidence of psychiatric symptoms that are more reliably associated with impairment, such as suicidal or homicidal ideation that requires risk management, extreme psychomotor retardation or agitation, extreme mood lability, morbid preoccupation with worthlessness or guilt, difficulties with reality testing, severe disorganization, severely disturbed speech, impulsivity or poor judgments that require intervention, multiple panic attacks with agoraphobia, dissociative states, or substance abuse that requires medical treatment.

AR at 000604-05.  Thus, Dr. Sugerman was distinguishing between a psychological injury and a severe psychiatric condition that would require psychiatric limitations or restrictions.  Defendant's reliance on Dr. Sugerman's opinion was not unreasonable.

Next, Plaintiff contends that the opinion of Plaintiff's treating physician, Dr. Abarbanel,

establishes Plaintiff's disability. In a letter dated January 16, 2014, Dr. Abarbanel stated:

> I have treated Mr. Gordon previously from May 2002 through June 2003. I treated him for the psychiatric condition of Major Depressive Disorder with anxiety; I cannot render an opinion regarding his physical condition at that time except to note that he was in pain and on pain medication. Those medications, I should add, exacerbated the functional limitations caused by his psychological condition.
>
> At the time I treated him he was disabled from doing his work at Borland Software Company due to his psychological conditions. He was suffering from severe depression and anxiety due in large part to the way the management at Borland treated him. At that time, he exhibited many of the symptoms of Post-traumatic disorder from their treatment of him; those symptoms did not disappear when he found himself unemployed and unemployable. His psychological condition affected his ability to concentrate, remember important facts, and to deal with others. He would not have been able to concentrate enough to perform any occupation and could not take instruction or criticism from employers. The anxiety generated by performing any job would have been unbearable for him.
>
> I have recently seen him on 1-9-14 and 1-16-14. I found at those time that his psychological condition continues to preclude him from work. He has trouble dealing with the stresses of daily life even without the burden of job responsibilities. If he tried to cope with the stresses of a full time job, I believe he would respond with serious depressive and anxiety symptoms.

AR at 000576. On April 18, 2014, Dr. Abarbanel opined that Plaintiff was "totally disabled from his job." AR at 000330.

Dr. Sugerman considered Dr. Abarbanel's letters, and acknowledged that Plaintiff suffered from a psychiatric condition. Dr. Sugerman, however, disagreed with Dr. Abarbanel's conclusion that the psychiatric condition rendered Plaintiff totally disabled within the meaning of the Plan. A disagreement among two physicians does not render Defendant's disability determination unreasonable.

Plaintiff next takes issue with Defendant's determination that Plaintiff did not suffer from a disabling degree of pain. Among other things, Plaintiff points to the opinion of Plaintiff's physician, Dr. David Resneck-Sannes, prepared in 2009, as evidence of disabling pain. In that

opinion, Dr. Resneck-Sannes opined that in February of 2002, Plaintiff suffered from disabling back pain for degenerative disc disease, chronic migraine headaches and failed knee and shoulder surgery. Plaintiff also relies on a letter dated January 22, 2014 in which Dr. Resneck-Sannes stated:

> During the time of 2002-2004 he was seen 13 times in my office. During that time he had treatment such as shoulder injections and medication renewals. The pain medications prescribed were for his neck, back and joint pains requiring various combinations of anti-inflammatory and narcotic preparations. Several of these medications are known to affect cognition and impeded focus.
>
> These conditions, and the pain medications he took because of them, made it hard for Mr. Gordon to work. In 2002 Mr. Gordon's ability to sit still and work at a desk would be limited because of his back problems. Furthermore, his ability to concentrate would have been impeded due to his constant chronic pain and the pain medications he was taking, which are known to affect cognition and focus. In 2002, Mr. Gordon was unable to work a full time sedentary job, especially one that required a lot of focus and concentration. Any other problems Mr. Gordon suffered from would have only exacerbated his disabling condition.

AR at 000574. Dr. Resneck-Sannes prepared another letter dated May 15, 2014 in which he stated that he had treated Plaintiff for back pain for over twelve years and that Plaintiff's back pain was severe enough to prevent him from working. AR at 000399.

Dr. Jane St. Clair, however, reviewed Dr. Resneck- Sannes' records, as well as the records of Plaintiff's other treating physicians, and reasonably concluded that the medical records did not support functional physical limitations for the continuous time period from April 19, 2002 to the date of her report. While acknowledging that Plaintiff had dealt with many chronic medical conditions throughout the years and had taken various medications, Dr. St. Clair determined that "[t]here is no documentation that severity of his musculoskeletal complaints existed at the time of disability (4/19/02)." AR at 000680. Dr. St. Clair reviewed Plaintiff's medical records at least twice in search of evidence of treatment for pain management, and noted that Dr. Resnick-Sannes saw Plaintiff on February 5, 2002, and then not again until June 23, 2003. AR at 000656. In an

1  addendum, Dr. Jane St. Clair concluded:

2

3         There is no question that Mr. Gordon had musculoskeletal issues
       that cause chronic pain in multiple areas, starting back many *years
4      prior to the workplaces changes* in 2002. He had managed them
       well with minimal medications for years; other than one reference to
5      MS Contin and OxyContin (Resneck Sannes, 1/8/05), most of the
       medications lists include only propoxyphene. This use of minimal
6      medication is perhaps how he was able to perform well as a senior
       programmer at Borland for so many years. The changes in the
7      workplace were a source of new stress for him. Decreased coping
       abilities for increasing stressors can cause the perception increased
8      pain at levels that were previously manageable.

9         This reviewer believes that his attention to his workplace issues and
       their psychological effects . . . made it more difficult to seek medical
10      attention for the chronic pain issues. While he sought psychological
       help and medications to deal with his increasing anxiety, depression,
11      low mood, he failed to focus on the physiological symptoms: neck
       pain, shoulder pain, and low back pain.

12

13  AR at 000389. Thus, Dr. St. Clair repeatedly acknowledged that Plaintiff suffered from chronic

14  pain. What is missing from Plaintiff's medical records, however, is documentation of pain

15  management treatment to show that the severity of Plaintiff's pain rendered him disabled within

16  the meaning of the Plan. In the absence of such documentation, it was not unreasonable for

17  Defendant to conclude that Plaintiff was not disabled within the meaning of the Plan.

18      Plaintiff's multiple criticisms of Dr. St. Clair's evaluation, which border on unprofessional,

19  are unfounded. Dr. St. Clair clarified her analysis in an addendum dated June 29, 2014:

20         Mr. Gordon had residual physical abilities in spite of the chronic
       daily pain he experienced. My interpretation of the situation (from
21      review of the documentation) was that he desired to continue to
       work, was released to work in another department, and when this
22      was not allowed, he was terminated. Mr. Gordon had the capacity to
       work in a similar position in a less stressful setting, most likely at
23      another company. Without a new job and with no opportunity to
       work at Borland, his work opportunities were limited, but his ability
24      to work remained physically intact.

25  AR at 000353. There is evidence in the record to show that Plaintiff desired to work and was

26  released to work by both Dr. Koopman and Dr. Zweng; it was not unreasonable for Dr. St. Clair to

27

infer from these facts that Plaintiff had the capacity to work in a different setting.

Plaintiff attempts to discredit each of Defendant's medical reviewers by highlighting how much money Defendant has paid them. The fact that the medical reviewers are compensated for their services, however, is unremarkable in and of itself. See e.g. Polnicky v. Liberty Life Assurance Company of Boston, 2014 WL 969973 (N.D. Cal. 2014) (denying request for discovery re consulting physician's compensation); Lavino v. Metro. Life Ins. Co., 779 F.Supp.2d 1095, 1104 (C.D. Cal. 2011) (finding evidence that "MLS performed 77 examinations for MetLife between 2009 and September 2010, for which MetLife had paid $118,816.25" not probative of bias); Nolan v. Heald College, 745 F.Supp.2d 916, 923 (N.D. Cal. 2010) (concluding that statistics showing that MetLife paid NMS $236,490 in 2002, $569,795 in 2003, $838,265 in 2004, and $1,671,605 in 2005 for independent medical opinions "are not probative of bias"). Absent from the record in this case is any evidence that the reviewing physicians' compensation was improper, i.e. that they were paid only if they found in Defendant's favor, were paid for incomplete reviews, or their compensation was excessive by industry standards.

Lastly, Plaintiff faults Defendant for relying upon the opinions of medical reviewers who never examined Plaintiff. In-person medical examinations, however, are not mandated under ERISA. Rather, a failure to obtain an in-person medical examination "is merely a factor to be considered when determining whether a plan administrator abused its discretion." Nolan v. Heald College, 745 F.Supp.2d, 916, 923 (N.D. Cal. 2010), citing Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 2352 (2008). A "pure paper review" does not constitute an abuse of discretion. Corby v. Unum Life Ins. Co. of America, 2010 WL 3768040, *5 (N.D. Cal. 2010); see also Bender v. Hartford Life Ins. Co., 2011 WL 3566483, *13 (N.D. Cal. 2011). Moreover, it is questionable whether an in-person exam of Plaintiff would have been helpful because there was more than a seven year lapse between the claimed date of disability and the date the claim was filed.

//

United States District Court
Northern District of California

<u>V.  CONCLUSION</u>

The reports by Defendant's examiners demonstrate a thorough consideration of Plaintiff's medical records and a rational basis for concluding that Plaintiff was not disabled within the meaning of the Plan.  Plaintiff has not carried his burden to show that Defendant's denial of benefits was illogical, implausible or unsupported by inferences from the record.  Accordingly, Defendant's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated:  September 7, 2017

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 5:10-cv-05399-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT