**THE FLEISHMAN LAW FIRM**
CHARLES J. FLEISHMAN (SBN 46405)
PAUL A. FLEISHMAN (SBN 251657)
A Professional Corporation
21243 Ventura Blvd., Suite141
Woodland Hills, California 91364
erisa@erisarights.com
Telephone:  (818) 805-3161
FAX: (818) 805-3163
Attorney for `Plaintiff`

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT GORDON,<br><br>    Plaintiff,<br><br> vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, a corporation; DOES 1 through 10, inclusive,<br><br>    Defendants | NO. CV 10-cv-5399 EJD (HRL)<br><br>PLAINTIFF'S RESPONSE TO DEFENDANT'S OPPOSITION BRIEF<br><br>Date:  September 26, 2019<br>Time: 9:00 am<br>Courtroom: 4<br>Judge: Honorable Edward J. Davila |

## <u>Table Of Contents</u>

I. Introduction   1

II. Argument   1

    1. Dr. Koopman At Santa Cruz Urgent Care Clinic Took Mr. Gordon Off Work On April 19, 2002 And Again On May 4, 2002.   1

    2. The Records From After Mr. Gordon Was Fired Show That The Disabling Anxiety And Depression Caused By Mr. Gordon's Treatment At Work Persisted After He Stopped Working And Prevented Him From Working.   3

    3. Tests Performed On Mr. Gordon In 2002 And 2003 Showed Abnormalities In His Memory And Concentration.   5

    4. Mr. Gordon Was Fired From His Job Due To Poor Performance And The Record Shows That Before He Stopped Working He Was Having Difficulty Keeping Up With His Work Load.   6

    5. The Doctors Hired By Metlife Are Not Credible Witnesses Of Mr. Gordon's Condition.   8

    6. Metlife Did Not Rely On The Opinions Of Its Independent Physician Consultants.   11

    7. Metlife's Opposition Brief Substitutes The Opinion Of Its Lawyer For The Opinions Of The Doctors Found In The Record.   13

III. Conclusion   15

# Authority Cited

**Cases:**

Black & Decker v. Nord, 538 U.S. 822, (2003)      11

Gordon v. Metro. Life Ins. Co., 747 F. Appx 594 (9th Cir. 2019)      12

Haley v. City of Plainfield, 169 Fed. Appx. 670 (3d Cir. 2006)      10

Hawkins v. First Union, 326 F.3d 914 (7th Cir. 2003)      8

Hill v. Colvin 807 F.3d 862 (7th Cir. 2015)      7

Joseph v. City of Dallas, 277 Fed. Appx. 436 (5th Cir. 2008)      10

Kalish v. Liberty Mutual, 419 F3d 501 (6th Cir. 2005)      10

Nguyen v. Charter, 100 F.3d 1462 (9th Cir. 1996)      3

Palmer v. University Medical Group, 994 F. Supp. 1221 (Or. 1998)      8

Reddick v. Chater 157 F.3d 715 (9th Cir. 1998)      7

Salley v. DuPont 966 F.2d 1011 (5th Cir. 1992)      12

Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666
(9th Cir. 2011)      15

Smith v. Metro. Life Ins. Co., 274 Fed.Appx. 252 (4th Cir. 2008)      11

Vertigan v. Halter 260 F.3d 1044 (9th Cir. 2001)      7

Weisner v. Liberty Life Assur. Co., 192 F.Supp.3d 601 (D. Md. 2016).      11

Westfall v. Liberty Life Assur. Co., 2018 U.S. Dist. Lexis 32641
(N.D. Ohio, 2018)      11

# I. Introduction

In its opposition to Plaintiff's motion for judgment MetLife misrepresents Mr. Gordon's medical record, misrepresents Plaintiff's claims and arguments, and substitutes the medical opinions of its lawyers for those of its doctors to justify a decision MetLife never made.

The record in this case shows that the doctors who treated and examined Mr. Gordon in 2002 and 2003, when he stopped working, believed he was unable to continue working as a computer programmer and that he has been unable to work ever since.

# II. Argument

## 1. Dr. Koopman At Santa Cruz Urgent Care Clinic Took Mr. Gordon Off Work On April 19, 2002 And Again On May 4, 2002.

MetLife asserts that when Mr. Gordon made his claim for disability benefits,

"He asserted continuous physical disability starting April 19, 2002. That date did not coincide with a contemporaneous finding that he was unable to work, but was shortly before his employment – and thus his coverage under the Plan – ended." Docket #88, p.5/6-10.

Firstly, Mr. Gordon's original claim did not assert that he was disabled from only his physical disability. In his initial application Mr. Gordon wrote,

"Since early 2002, I have not been able to work due to chronic pain and illness from: - Arthritis In the spine and joints - Severe Insomnia - Collapsed thoracic vertebra - Very large spinal osteophytes - Herniated vertebral discs - Severe cervical foraminal stenosis – **Depression** - Chronically active HSV-2 virus - Chronically active HHV-6 virus – **Anxiety – ADD** - Heart palpitations **- Impaired short-term memory** - Migraine headaches - Chronic system Inflammation (Chronic elevated C-Reactive Protein) - Left knee surgery - Cervical spine surgery - Left shoulder surgery – Apico / Jaw surgery - Sinus surgery - Thoracic and lumbar disc disease - Chronic esophagitis - Chronic sinusitis" AR 1442, emphasis added.

He has always maintained that he has been disabled since 2002 due to a large number of physical and psychological problems.

Secondly, on April 19, 2002, Mr. Gordon was taken off work by Dr. Jane K. Koopman. AR 1112. She noted, "This patient initially had difficulty even starting

to speak; appeared to be very stressed." AR 1112. Mr. Gordon sought medical attention because the day before Mr. Gordon's boss had approached him in a way that made him feel physically threatened, and left him sweating with his heart racing. AR 1111. Mr. Gordon had been experiencing heart racing episodes for several days. AR 1112. Dr. Koopman was examining Mr. Gordon at the Santa Cruz Medical Clinic, and not at his place of work or near his supervisor. Mr. Gordon's anxiety and depression persisted even after he was away from work and his supervisor. On April 19, 2002, Mr. Gordon told Dr. Koopman that he had been having trouble sleeping, and "he has been having trouble concentrating and difficulty with his memory." AR 1111. Dr. Koopman's assessment was that Mr. Gordon was suffering from a "stress reaction with both anxiety and depressive features." AR 1112. Besides taking Mr. Gordon off of work, Dr. Koopman had Mr. Gordon use a Holter monitor to rule out an arrhythmia. AR 1112.

Soon thereafter, Mr. Gordon went to a Worker's Compensation attorney. The attorney suggested to Mr. Gordon that he should try to return to work if he could be transferred to another department. AR 1113. On April 26, 2002, Dr. Koopman wrote a letter for Mr. Gordon allowing him to return to work, but advising a transfer to another department "if he is to avoid further flare-ups in his symptomatology." AR 1113.

On April 29, 2002, Mr. Gordon was again seen at Santa Cruz Medical Clinic where he was seen by Dr. Dean G. Zweng[1]. Dr. Zweng noted that Mr. Gordon was tearful and in a low mood. AR 1116. He noted that upon further questioning Mr. Gordon had reported that he was having "chronic feelings of irritability and inability to make decision, sleep disturbance, anxiety and agitation. It was noted

---

[1] MetLife incorrectly states that Mr. Gordon saw Dr. Koopman on this date. Docket #88, p.9/14-15.

that Mr. Gordon had, "been on different anti-depressant medications in the past mainly to control his chronic pain issues of his neck and back." AR 1116. Despite all his problems, Mr. Gordon told Dr. Zweng, "He feels like he needs to get back to work, although it does not feel too much better." AR 1116.  Dr. Zweng assessed Mr. Gordon as suffering from an adjustment reaction with anxiety and depression with probably underlying major depression, but released him to return to work anyway. AR 1116. "[I]t is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects potentially serious mental illness."  Nguyen v. Charter, 100 F.3d 1462, 1465 (9th Cir. 1996).

2. The Records From After Mr. Gordon Was Fired Show That The Disabling Anxiety And Depression Caused By Mr. Gordon's Treatment At Work Persisted After He Stopped Working And Prevented Him From Working.

On May 1, 2002, Mr. Gordon was seen by Dr. William C. Mears. Dr. Mears noted that Mr. Gordon was still suffering from anxiety, rapid heartbeat, and an inability to sleep. AR 1119.

On May 4, Mr. Gordon saw Dr. Koopman complaining of diarrhea and reporting, "He does feel like he has lost 10 lb in the past week. He also reports that for several months he has been feeling like has been having low-grade fever and chills." AR 1122. Dr. Koopman assessed Mr. Gordon as still suffering from anxiety and depression and felt that Mr. Gordon's diarrhea may have been anxiety driven. AR 1122. Dr. Koopman wrote that Mr. Gordon was "to remain off work." AR 1123.

On May 11, 2002, Mr. Gordon again saw Dr. Mears. Dr. Mears wrote, "Regarding his adjustment disorder and depression and anxiety related to job stressors; apparently he was fired. **The stress has increased. He is still feeling as anxious and depressed as he was before."** AR 1126. Dr. Mears continued the off work status recommended by Dr. Koopman. AR 1127.

Mr. Gordon started seeing Dr. Abarbanel on May 15, 2002. AR 366.MetLife claims that Dr. Abarbanel's notes show that,

> "Gordon had experienced depression on and off for two years but by August 2002, after being away from Borland for three months, he no longer woke up depressed, and felt more functional. AR 369. He reported that his sadness was gone, he felt more comfortable socially, and he was seeing a career counselor. On September 4, 2002, he reported that he was working on a book, as well as a computer program. (*Id.*). Later office visit notes continued to document improvement, but said Gordon experienced anxiety when he had to deal with legal issues. AR 370-374." Docket #88, p.17/24-18/2.

When taken out of context, Dr. Abarbanel's notes from August 8, 2002 do seem to describe a patient on the mend. Notes from that day state that Mr. Gordon was feeling less depressed and more functional, although Dr. Abarbanel also wrote, "effect on focus and concentration not clear." AR 369. Also, Dr. Abarbanel's notes from September 4, 2002 do mention that Mr. Gordon was spending time working on a computer program and writing a book **"about back pain."** AR 369. But Dr. Abarbanel cautioned, "Need to rule out incipient manic episode." AR 369.

However, MetLife's claim that "Later office visit notes continued to document improvement" is simply not true. On October 21, 2002, Dr. Abarbanel wrote, **"Things aren't going as well as it sounded**. 'Sick' each morning […] Complains of brain shut-down with concentration (ala ADD)." AR 370, emphasis added. On November 13, 2002 Dr. Abarbanel wrote, "Patient feels harassment at work is being continued through company's attorney activity, **or basically PTSD response. Recalls sequence of threats from supervisor, requests for help rejected, and other demeaning treatment.**" AR 370, emphasis added. Although Mr. Gordon was no longer working at Borland and no longer had contact with his abusive supervisor, he was having PTSD reactions just from dealing with an attorney. By January 8, 2003, Mr. Gordon was receiving biofeedback treatment, and Dr. Abarbanel noted that he "Feels meds are helping, but not enough." AR 371. On February 13, 2003, Dr. Abarbanel wrote, "**Mood down; feels hopeless. Seems depression is primary; woke up with mood down.**" AR 372, emphasis

added. On April 11, 2003 Dr. Abarbanel wrote, "**Mood down X 2, 2 ½ weeks. Fatigue.**" AR 372. Rather than showing improvement, Dr. Abarbanel's notes after September 2002 show that even a year after Mr. Gordon stopped working he continued to suffer from depression and anxiety with symptoms of PTSD.

### 3. Tests Performed On Mr. Gordon In 2002 And 2003 Showed Abnormalities In His Memory And Concentration.

Defendant claims, "although Gordon reported anxiety, worry, and dysphoria, his doctors had ordered no tests for abnormalities in memory, concentration, attention, thought processing, or cognition." Docket #88, p.11/8-12. This is not true. Dr. Padgitt wrote that, Mr. Gordon's "PTSD symptoms are exacerbating his attentional and concentration difficulties," and that Mr. Gordon, "was assessed using quantitative EEG technology and showed abnormalities when compared to his asymptomatic peers." AR 713

Also, Dr. Meade examined Mr. Gordon on February 21, 2003, almost a year after he was fired from Borland. MetLife contends, "Even a year later, in 2003, [Mr. Gordon's] mental status examinations showed no significant lability or agitation, or significant abnormalities in thought processing." Docket #88, p.11/10-12. This is untrue. Dr. Meade wrote, "Mental status examination indicative of severe depression, with prominent secondary symptoms of anxiety and panic. The patient has significant compromise in short term and concentration abilities." AR 724. Based on Dr. Meade's examination, he found "There is ample medical evidence on today's examination that the patient is currently temporarily totally disabled on a psychiatric basis." AR 724. Not only did Dr. Meade find that Mr. Gordon was totally disabled in February 2003, but he opined that the disability, "developed in response to industrially related stress, namely the harassment and threatening of the patient by his immediate supervisor." AR 725. So in February 2003, a year after Mr. Gordon stopped working, Dr. Meade found Mr. Gordon to

be totally disabled due to severe depression with anxiety and panic, which was caused by his treatment while working at Borland.

MetLife argues, "Dr. Sugerman also noted that although the records showed symptoms of depression, Gordon did not have symptoms identified with an impairment caused by disabling depression." Docket #88, p.14/24-25. It is unclear what part of Dr. Sugerman's record review report MetLife is referring to as it simply cites to the entire report (AR 359-364), but If Dr. Sugerman wrote that then he clearly missed Dr. Meade's finding that Mr. Gordon not only was suffering "severe depression, with prominent secondary symptoms of anxiety and panic," but that he also "has significant compromise in short term memory and concentration abilities." AR 724.

### 4. Mr. Gordon Was Fired From His Job Due To Poor Performance And The Record Shows That Before He Stopped Working He Was Having Difficulty Keeping Up With His Work Load.

MetLife faults Plaintiff for noting that Borland wrote to Mr. Gordon that he was being fired for poor performance, claiming that "in context, 'performance' refers to disputes with his manager and the human resources staff." Docket #88, p.6/23-24. However, the record shows that Mr. Gordon was having trouble with his ability to do his job before he was fired. On April 19, 2002, Mr. Gordon complained to Dr. Koopman that, "[Mr. Gordon] has been having trouble concentrating and difficulty with his memory." AR 1111. Mr. Gordon told Dr. Meade that before he was fired, "I found myself completely on my own, and was overwhelmed by the amount of work I had to do without any assistance." AR 1146. Dr. Meade also noted that the last performance evaluation Mr. Gordon received at Borland stated that Mr. Gordon needed improvement at, "completion of projects according to public schedules, completion of projects as desired by customers, constructive utilization of time, completion of documentation necessary for continuing support on projects by others, and providing time estimates for new

projects." AR 1151. According to Dr. Meade, this was "the only questionable evaluation in the personnel file." AR 1156.

Moreover, the letter from Borland states that Mr. Gordon was made to attend a meeting with his manager, his HR representative and the VP of Human Resources regarding his performance. It continues that at the end of the meeting his HR representative suspended him until further notice. The letter then advises that after the meeting they discussed his actions during the meeting and "decided to terminate your employment with Borland, effective immediately." AR 1412. Nothing in the letter indicates that "'performance' refers to disputes with his manager and human resources staff."

MetLife argues,

"Overall, the records showed that Gordon was able to attend to his own needs, the needs of the household, and the needs of a disabled child. There also was no indication that he required significant personal assistance, something one would typically see if a person had a severely impairing psychiatric condition. AR 944." Docket #88, p.11/12-15."

The ability to perform acts of daily living do not equate with the ability to perform a regular job. Hill v. Colvin 807 F.3d 862, 869 (7th Cir. 2015), Vertigan v. Halter 260 F.3d 1044, 1050 (9th Cir. 2001), Reddick v. Chater 157 F.3d 715, 722 (9th Cir. 1998). Before Mr. Gordon stopped working he was a computer programmer. His job required that he be able to concentrate and take instructions. Dr. Abarbanel, made clear that due to Mr. Gordon's treatment at Borland he suffered from many of the symptoms of PTSD and,

"His psychological condition affected his ability to concentrate, remember important facts, and to deal with others. He would not have been able to concentrate enough to perform any occupation and could not take instruction or criticism from employers. The anxiety generated by performing any job would have been unbearable for him. AR 576.

MetLife argues that "Dr. Resneck-Sannes said that the pain medications he prescribed "are known to" affect cognition and impede focus, but offered no documentation that this was true in Gordon's particular case." Docket #88, p.15-

16/22-1. The record is full of instances where Mr. Gordon is noted to have impeded short term memory and concentration. AR 707-709, 713, 724, 727.

MetLife also argues that Mr. Gordon could not be disabled because "He did not explain how, if he was disabled, he nevertheless worked full time for years." Docket #88, p.13/28 Fn. #6. And "In light of these conflicting facts and records, Dr. St. Clair pointed out that Gordon's contemporaneous records showed that Gordon could and did work despite some pain issues, and that his performance evaluations were very good until just before his termination following disputes with a supervisor." Docket # 88, p.16/16-19. Courts have rejected the argument that a person could not be disabled from chronic pain because they previously managed to work with the chronic pain.

> "Standard notes that Ms. Palmer continued to work for almost 15 years while suffering from back and neck pain, and cites that as proof that she was not disabled. It equally tends to prove that she was not malingering. Despite her pain, for which she had been receiving medical care for all those years, she continued to work." Palmer v. University Medical Group, 994 F. Supp. 1221, 1236 (Or. 1998), emphasis added, abrogated on other grounds by Hensley v. Northwest Permanente, 258 F.3d 986, 995 (9th Cir. 2001).

Like Ms. Palmer, Mr. Gordon's insistence on returning to work does not prove that he was malingering. It proves that he felt he needed to get back to work. AR 1116 "A desperate person might force himself to work despite an illness that everyone agreed was totally disabling." Hawkins v. First Union, 326 F.3d 914, 918 (7th Cir. 2003).

### 5. The Doctors Hired By Metlife Are Not Credible Witnesses Of Mr. Gordon's Condition.

According to MetLife,

> "One of Gordon's less comprehensible arguments relates to Dr. St. Clair. He submitted on appeal two unexplained pages, apparently gleaned from an unknown site on the internet, about a Dr. Jill St. Clair (see ECF 86 at 14:8-10), from which he argues that the Dr. St. Clair who provided opinions on his records 'is a professional expert witness,' and then goes on to discuss how much she had been paid according to discovery in this case. None of these arguments, however, calls into question either her credentials or the validity of her observations and opinions after reviewing his records. The same is true of his discussion of a handful of cases in which her opinions

were criticized. His attempt to discredit her fails." Docket #88, p.21/26-22/24, Fn.8

First of all the document submitted by plaintiff during his appeal is about, "Jane T. St. Clair, MD." AR 332. It is not about somebody named Jill. I don't know where MetLife got Jill from. The document about "Jane T. St. Clair" states that her specialty is "Occupational Medicine." AR 332. The Dr. Jane T. St. Clair that MetLife hired also specializes in "Occupational Medicine." AR 353. If there was any doubt whether there were two Dr. Jane T. St. Clairs who specialized in Occupational Medicine, the document also provided her address, telephone number, fax number, and email. AR 332. The document was provided to MetLife on April 28, 2014. AR 329. MetLife could have easily verified whether they were the same person.

Secondly, the printout was not from an unknown site on the internet. The website's address is on the top of the printout, and was also provided in the letter Plaintiff sent with it. AR 332, 329. Also, it wasn't provided without explanation. As plaintiff explained to MetLife, "According to expertwitness.com Dr. St. Clair has been practicing for 23 years and in that time has only performed 200 exams. That is less than ten exams a year, less than one exam a month." AR 329. Plaintiff thought MetLife should know something about the doctor on whose opinion it was relying. As it turns out MetLife knew exactly on whose opinion it was relying.

MetLife claims, "Gordon's argument reduces to a contention that when MetLife complies with ERISA regulations by getting outside medical reviews for which the reviewing professional must be paid, such professionals' opinions automatically should be dismissed." Docket #88, p. 22/9-12. This is not Plaintiff's argument. Plaintiff is arguing that MetLife's doctors are not as credible as the other doctors in the record for two reasons. 1) The doctors hired by MetLife never saw Mr. Gordon and could only speculate about his condition based on the records of doctors who examined him and found him to be unable to work. And 2) the doctors

hired by MetLife had ongoing fiscal relationships with MetLife that may have influenced their speculation regarding Mr. Gordon's condition.

Discovery in this case shows that MetLife has hired Dr. St. Clair and the other record reviewing doctors to perform disability claim reviews in 2011, 2012, and 2013 and paid them substantial sums in each of those years. Docket #62-2, p.9/15-18. MetLife cites to two cases in an attempt to argue that the ongoing financial relationships between it and its record reviewers are not relevant to determining their credibility. Both <u>Joseph v. City of Dallas</u>, 277 Fed. Appx. 436 (5th Cir. 2008) and <u>Haley v. City of Plainfield</u>, 169 Fed. Appx. 670 (3d Cir. 2006) are inapposite in this case. Neither of these cases is governed by ERISA, and neither of these cases involves the credibility of expert (or even lay) witnesses. These cases are about the necessary showing a plaintiff must make in an anti-discrimination case in order to establish a prima facie case. In <u>Joseph</u> the court found that evidence that "between August 2005 and August 2006 applicants to the [Police Department] over the age of forty were hired at a lower rate than younger applicants" did not by itself help establish a prima facie case of age discrimination. <u>Id.</u> at 442. The court in <u>Haley</u> made a similar finding, but regarding "[T]he racial composition of the officers who were promoted." <u>Id.</u> at 674.

In this case, Plaintiff has provided evidence that MetLife had an ongoing financial relationship with the doctors it hired to review Mr. Gordon's medical records. They are the only doctors in the record who have opined that Mr. Gordon was not disabled when he stopped working, despite being the only doctors who never examined him. "The Supreme Court has acknowledged 'that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers[' ] money and preserve their own consulting arrangements." <u>Kalish v. Liberty Mutual</u>, 419 F3d 501, 507-508 (6th Cir. 2005).

Also, the fact that the opinions of Drs. St. Clair and Sugerman have been strongly criticized by other courts is relevant to their credibility. In 2008, the Fourth Circuit faulted MetLife for relying on Dr. St. Clair's opinion, holding that even under an abuse of discretion standard Dr. St. Clair's opinion did not "present a basis a reasoning mind would accept as sufficient to support its decision." <u>Smith v. Metro. Life Ins. Co</u>., 274 Fed.Appx. 252, 257 (4th Cir. 2008). In <u>Smith</u>, as in this case, Dr. St. Clair accepted the medical findings of the treating doctors while denying their conclusions regarding disability. <u>Id</u>. Also, in cases from 2016 and 2018 courts found that MetLife's Dr. Sugerman cherry picked symptoms to reverse engineer a diagnosis, and reached a conclusion without any basis. <u>Westfall v. Liberty Life Assur. Co.</u>, 2018 U.S. Dist. Lexis 32641, *16-17 (N.D. Ohio, 2018), <u>Weisner v. Liberty Life Assur. Co</u>., 192 F.Supp.3d 601, 619, Fn 15 (D. Md. 2016).

MetLife had ample opportunity to share Dr. St. Clair's credentials with us and tell us why we should accept her conclusions and the conclusions of its other record reviewers over those of Mr. Gordon's treating and examining doctors. MetLife has still not done so as it still has not issued a final decision on appeal.

<u>6. Metlife Did Not Rely On The Opinions Of Its Independent Physician Consultants.</u>

MetLife argues that it "was entitled to credit opinions of medical professionals, such as Drs. Becker, Sugerman and St. Clair, even if their opinions contradicted those of a treating physician." Docket #88, p.21/24-22/1. First of all, even when the standard of review is abuse of discretion, "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." <u>Black & Decker v. Nord</u>, 538 U.S. 822, 834 (2003). Also, it just makes sense that honest doctors would not come up with opinions that are contrary to a treating or examining doctors' findings without independent inquiry. After all, the record reviewers have to base their opinions on the findings of the doctors with firsthand experience with the patient. In the words of

MetLife's Dr. Sugerman, any finding not based on "direct assessment" is "speculation." AR 536. See also <u>Salley v. DuPont</u> 966 F.2d 1011, 1015-1016 (5th Cir. 1992).

Moreover, the issue in this case is not whether MetLife was entitled to credit the opinions of record reviewing doctors over the opinions of doctors with firsthand knowledge of the claimant. The standard of review is de novo in this case because MetLife never decided Mr. Gordon's appeal. While MetLife argues that it was entitled to credit the opinions of its record reviewers, it never made a claim decision that relied on or credited the opinions of Drs. Sugerman or St. Clair. At the Ninth Circuit, MetLife tried to place the blame for its failure to decide Mr. Gordon's appeal on Mr. Gordon, claiming that it "still was evaluating [Mr. Gordon's] claim when he began to importune the district court to allow the litigation to resume despite the fact that the appeal process was ongoing." 9th Cir. case 17-16821, Docket #16, p.36. The Ninth Circuit rejected this explanation. <u>Gordon v. Metro. Life Ins. Co.</u>, 747 F. Appx 594, 595 (9th Cir. 2019). MetLife now tries to blame the court claiming that it has not decided Mr. Gordon's claim because of the "the substantial procedural confusion that has reigned in this case." Docket #88, p.19/12-13. This simply does not match the facts.

On August 25, 2014 Plaintiff wrote to MetLife,

> "It is time for you to decide Mr. Gordon's claim. You can either follow the opinions of the record reviewers you have paid who have never seen Mr. Gordon, or the opinions of doctors who have treated Mr. Gordon's conditions for years and written several letters supporting his disability; letters for which they received no compensation. I look forward to your decision." AR 336-337.

On October 3 and October 29, 2014 Plaintiff again wrote to MetLife seeking a decision on Mr. Gordon's appeal. AR 334, 335. Throughout this time the current action was closed and there were no pending litigation events to confuse MetLife. There was just a claimant seeking a decision on his appeal. If that process confuses MetLife, perhaps it should not be in the insurance business.

This Court agreed to reopen the case on December 19, 2015, almost 4 months after Plaintiff's appeal had been fully submitted to MetLife and MetLife had gotten its last record review report, but MetLife still had not issued a decision. Docket # 45. After the case was reopened, on February 11, 2015, MetLife told the Court,

> "Based upon the Court's Order Granting Plaintiff's Motion to Reopen Case, wherein the Court ordered the case restored to active litigation so that it may proceed in parallel to any remaining administrative proceedings, MetLife is moving forward with rendering its decision and expects to issue the decision within the next week." Docket #51, p. 6/19-23.

But, even after the Court gave MetLife the opportunity to finally decide Mr. Gordon's appeal during active litigation and after MetLife told the Court it would issue a decision at a set time, MetLife still did not issue a decision. The blame lies squarely on MetLife and not the Court.

## 7. Metlife's Opposition Brief Substitutes The Opinion Of Its Lawyer For The Opinions Of The Doctors Found In The Record.

Plaintiff's opening brief discussed how the medical opinions of the doctors who treated and examined Mr. Gordon differed from the opinions of the doctors MetLife hired. However, in its opposition brief, MetLife substituted the opinion of its lawyer for that of its doctor.

Dr. St. Clair noted that when Mr. Gordon stopped working he was suffering from "chronic daily pain," (AR 353) and that,

> "He has documentation that supports the presence of degenerative disc disease and other problems present prior to the period leading up to the firing from his position. Stress from the working environment would have made his underlying pain feel worse. The behaviors he described in the workplace (from the immediate supervisor to the HR personnel) could have aggravated the physical condition, making it hard for him to work, as Dr. Resneck-Sannes postulates." AR 503.

Regardless, MetLife argues that Mr. Gordon was not suffering from any physical problems when he stopped working because,

> "The few records contemporaneous to the period April 19 to May 1, 2002, do not document treatment of the physical conditions Dr. Resneck-Sannes listed as disabling in his APS, beyond Gordon's statement to a workers'

13

compensation doctor that he took pain pills for his neck and back." Docket #88, p.7/22-25.

But Dr. St. Clair had an explanation for the relative paucity of physical treatment immediately around the time Mr. Gordon stopped working.

> "This reviewer believes that his attention to his workplace issues and their psychological effects (increased anxiety and depression as documented) made it more difficult to seek medical attention for the chronic pain issues. While he sought psychological help and medications to deal with his increasing anxiety, depression, low mood, he failed to focus on the physiological symptoms: neck pain, shoulder pain, and low back pain." AR 504.

MetLife argues that Mr. Gordon did not have any physical problems when he was examined by Dr. Meade because,

> "Dr. Meade asked about non-industrial stressors, and Gordon said he had cared for his disabled daughter for 10 years. AR 1147. Dr. Meade continued, 'Otherwise, [Gordon] *denies other medical*, relationship, family, legal and financial *problems*.' *Id.* [emphasis added]." Docket #88, p.10/2-4.

But MetLife acknowledges that Dr. Meade also pointed out that, "In 2000, he was diagnosed with hypertension, and with migraine headaches. In 1986 or 1987, he sustained a back injury, but has not had surgery for this. He indicates that the injury is at an unknown level in his low back." Docket #88, p.10/13-15, AR 1148. Further, Dr. Meade wrote that "Axis III: Disc problem of unknown nature, hypertension, migraine headache, per patient report and medical records." Dr. Meade acknowledged Mr. Gordon's physical problems. As Dr. Meade explained, "Comment on exacerbation of non-psychiatric medical conditions, such as migraine headaches and hypertension, is deferred to the appropriate medical specialist." AR 1155. Dr. Meade recognized that Mr. Gordon was suffering from chronic physical conditions when he was examined, but did not comment on them because they were not his specialty.

In August 2003 Mr. Gordon saw Dr. Michael Butcher regarding his various musculoskeletal problems. On August 5, 2003, Dr. Butcher reported that Mr. Gordon, "Has multiple musculoskeletal complaints including in order of severity: Neck pain, upper back pain, shoulder pain, left knee pain and hip pain. He states

his activity is very limited." AR 1159. Dr. Butcher's examination revealed, "[Mr. Gordon] appeared to have stiffness and limited range of motion in the neck and back. There is swelling in the left knee." AR 1159. Dr. Butcher ordered a series of MRIs (AR 1160-1172) and a nerve conduction study (AR 1177-1179). These tests confirmed that Mr. Gordon had, "documented degenerative disc disease of the neck and low back. He has arthritis in the right shoulder. He has torn cartilage in the left knee." AR 1193. Based on these findings Dr. Butcher confirmed Mr. Gordon, "is unable to work because of his multiple musculoskeletal problems." AR 1193. In fact, the Social Security Administration has found that since December 13, 2003, not only has Mr. Gordon been disabled from performing his own occupation, but also any occupation in the national economy. AR 1085, Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 672 (9th Cir. 2011).

### III. Conclusion

The doctors who treated and examined Mr. Gordon opined that he was disabled from working at the time he stopped working. His employer believed he was no longer capable of performing his job and fired him for poor performance. Their opinions are more credible than the opinions of the doctors who MetLife hired and who have never seen Mr. Gordon.

This Court should find for Plaintiff and order MetLife to provide 1) past-due benefits, 2) prejudgment interest on those benefits, 3) costs, and 4) attorney's fees, and the matter should be remanded to MetLife to calculate the amount of past-due benefits which are owed.


Dated: June 18, 2019

Respectfully Submitted:                        /s/Paul Fleishman
                                                Paul Fleishman
                                                Counsel for Plaintiff