UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBERT GORDON,<br><br>               Plaintiff,<br><br>     v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>               Defendant. | Case No.  5:10-cv-05399-EJD<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52; GRANTING DEFENDANT'S CROSS-MOTION FOR JUDGMENT UNDER FRCP 52**<br><br>Re: Dkt. No. 86 |

I.  INTRODUCTION

In this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq*. ("ERISA"), Plaintiff Robert Gordon ("Plaintiff") seeks long term disability benefits from Defendant Metropolitan Life Insurance Company ("Defendant").  Plaintiff contends that the medical records show that he was forced to leave his employment with Borland Software "Borland" due to severe depression, anxiety, and symptoms of post-traumatic stress disorder caused by harassment and threats from his immediate supervisor at Borland.  Pl.'s Mot. For J. Under FRCP 52 (Dkt. No. 86).  Plaintiff contends that these psychological conditions, in conjunction with spinal, knee and shoulder injuries, left him totally disabled.  *Id*.  Presently before the Court are the parties' competing motions for judgment under Federal Rule of Civil Procedure 52.  Based upon all pleadings, the evidentiary record, and the comments of counsel and for the

reasons set forth below, the Court DENIES Plaintiff's motion for judgment and GRANTS Defendant's motion for judgment.

## II. BACKGROUND

Plaintiff worked as a Senior Staff Systems Programmer with Ashton-Tate starting in 1989. In 1991, Ashton-Tate was purchased by Borland and Plaintiff worked for Borland until May 1, 2002. As a Borland employee, Plaintiff was eligible for LTD benefits through the Borland Software Corporation LTD Plan ("the Plan"), which is governed by ERISA. The Plan covered Eligible Employees (active, full-time employees working 30 hours per week). Administrative Record ("AR") at 1462, 1466, 1487. Defendant MetLife funded LTD benefits under the Plan and was also the claim administrator for the LTD claims.

To receive LTD benefits under the Plan, Plaintiff must have been "disabled" and "unable to earn more than 80% of [his] Earnings or Indexed Predisability Earnings at [his] Own Occupation for any employer in [his] Local Economy." AR at 1470. The Plan defines "Disabled" in pertinent part as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.  during your Elimination Period and the next 60 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy . . .
> 2.

*Id.* "Appropriate Care and Treatment" means "medical care and treatment that meet all of the following: 1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability; 2. it is necessary to meet your basic health needs and is of demonstrable medical value; 3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies; 4. it is consistent with the diagnosis of your condition; and 5. its purpose is maximizing your medical improvement." AR at 1471. "Elimination Period" means "90 days of

continuous Disability."  AR at 1463.  A participant's "Own Occupation" is defined as:

> the activity that you regularly performed and that serves as your source of income.  It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

AR at 1471.  The Plan provides that the claimant's loss of earnings "must be a direct result of [the claimant's] sickness, pregnancy or accidental injury."  AR at 1470.  The Plan contains a 24-month limitation for disabilities due to a mental or nervous disorder or disease.  AR at 1485.

On April 19, 2002,  Dr. Koopman placed Plaintiff off work for one week.  AR at 1112. Plaintiff returned to Dr. Koopman's office one week later on April 26, 2002.  AR at 1113. Plaintiff planned to return to work to work on April 29, 2002.  *Id*.

He returned to work on May 1, 2002, but was terminated that same day due to "performance issues"[1] and his behavior at a meeting with Human Resources. AR at 1412-13. Upon termination, Plaintiff ceased to be an Eligible Employee and his coverage under the Plan ended. AR at 1487.  On August 22, 2005, the Social Security administration found Plaintiff disabled as of December 13, 2003.  AR at 1085.

On October 22, 2009, Plaintiff submitted a claim for LTD benefits for a disability beginning April 19, 2002.  AR at 1440.  He indicated on the claim form that he suffered from the following conditions that prevented him from performing his job:  arthritis in the spine and joints; severe insomnia; collapsed thoracic vertebra; very large spinal osteophytes; herniated vertebral discs; severe cervical foraminal stenosis; depression; chronically active viruses; anxiety; ADD; heart palpitations; impaired short-term memory; migraine headaches; chronic system inflammation; left knee surgery; cervical spine surgery; left shoulder surgery; Apico/jaw surgery; sinus surgery; thoracic and lumbar disc disease; chronic esophagitis; and chronic sinusitis.  AR at 1440-41.  Accompanying Plaintiff's claim form was a note from his treating physician, Dr.

---

[1] Plaintiff suggests that the "performance issues" are indicative of the symptoms Plaintiff reported to Dr. Koopman on April 19, 2002: that Plaintiff was having trouble concentrating and difficulty with his memory.  Pl.'s Resp. to Def.'s Opp'n Br.  6.

Resneck-Sannes, dated October 15, 2009, which indicated that the most recent date of treatment was October 15, 2009, and stated that Plaintiff had "disabling back & neck pain for degenerative disc disease," "chronic migraine headaches," and "failed knee and shoulder surgery" since February of 2002. *Id*.

Plaintiff initiated this action in November of 2010. *See* Compl., (Dkt. No. 1). Pursuant to stipulation, the action was stayed while Defendant resolved Plaintiff's appeal. In 2012, Defendant determined that Plaintiff had coverage under the Borland Plan through May 1, 2002 (AR at 947), and notified Plaintiff that his LTD claim was denied because the information in the claim file did not support a finding of Disability. AR at 776. Plaintiff appealed Defendant's decision. Defendant has not issued a formal decision on Plaintiff's appeal.

The Court lifted the stay and restored the case to active litigation in January of 2015. Dkt. No. 48. The Court determined that Defendant's benefit decision was subject to review under an abuse of discretion standard. Dkt. No. 60. The parties filed cross-motions for summary judgment. Dkt. Nos. 62, 64. By order dated September 7, 2017, the Court denied Plaintiff's motion, granted Defendant's motion, and entered judgment in favor of Defendant. Dkt. Nos. 72, 73. On appeal, the Ninth Circuit reversed and remanded, holding that the denial of benefits is subject to *de novo* review and that the competing medical opinions regarding Plaintiff's disability created a genuine dispute of material fact. The parties now cross-move for judgment under Federal Rule of Civil Procedure 52.

### III. STANDARDS

In conducting a *de novo* review, the court considers the record and then "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). An ERISA *de novo* review is a bench trial in which the district court sits as finder of fact and determines, as a factual matter, whether the claim should have been approved. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999); *Frank v. Wilbur-Ellis Co. Salaried Employees LTD Plan*, No. 08-284 LJO, 2009 WL

347789, at *5 (E.D. Cal. Feb. 11, 2009) (on *de novo* review, court determines whether benefit decision was correct or incorrect). The court first examines the governing plan documents. *Metro. Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006); *Gertjejansen v. Kemper Ins. Companies, Inc.*, No. 06-56329, 274 Fed. Appx. 569, 571 (9th Cir. 2008). The court then makes an independent determination of the claim on the merits. *Parra v. Life Ins. Co. of North Am.*, 258 F. Supp. 2d 1058, 1064 (N.D. Cal. 2003). When a court conducts a *de novo* review, the burden of proof is on the claimant. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295 (9th Cir. 2010).

## IV. DISCUSSION

Having conducted a *de novo* review, the Court finds that the Plan correctly determined that Plaintiff was not "Disabled" from performing his "Own Occupation" prior to his May 1, 2002 termination date. Although the Administrative Record confirms that Plaintiff suffered from multiple medical conditions prior to May 1, 2002, the medical records fail to establish (1) that Plaintiff was receiving care and treatment for any of those medical conditions on a continuing basis and (2) that during the Elimination Period and the next 60 month period Plaintiff was unable to earn more than 80% of his Earnings or Indexed Predisability Earnings at his Own Occupation for any employer in his Local Economy.

### Dr. Koopman's Assessment and Notes in April of 2002

Included in the Administrative Record is an April 19, 2002 workers' compensation report by Dr. Jane Koopman with the Santa Cruz Medical Clinic. AR at 1111-12. Dr. Koopman described Plaintiff as "a 49-year old staff systems programmer at Borland who presents complaining of emotional distress" arising out of Plaintiff's working conditions and a hostile supervisor. AR at 1111. Specifically, Dr. Koopman's notes included the following description of Plaintiff's work conditions:

> History here is that there have been some changes of personnel over the last nine months at his work. This has placed a great deal of stress on his boss who has been passing some of this on to the patient. He has been threatening to fire him and berating him in public. He has been given contradictory orders. The patient has

> complained to Human Resources three times in the past couple of months. Yesterday, there was an episode where his boss accused him of mismanaging a project that was not even his. The patient turned around and walked away. His boss approached him in such a manner, that he actually felt physically threatened. There was no altercation, but shortly afterward the patient felt quite nauseated with his heart racing, sweating and went and informed his employer that he was leaving work for the day.

*Id*. Dr. Koopman noted that Plaintiff was taking blood pressure medication, Ativan and Topamax; that he was having difficulty falling asleep and waking up; that he has been having trouble concentrating and difficulty with his memory; that he reported feeling depressed; and that "heart racing episodes" have been occurring for several days, but these episodes do not involve shortness of breath, chest pain or nausea. AR at 1111-12. Dr. Koopman observed that Plaintiff initially had difficulty even starting to speak and appeared very stressed. Dr. Koopman's assessment was that Plaintiff had "1. Stress reaction with both anxiety and depressive features. 2. hypertension. 3. Complaints of palpitations-probably part of his anxiety but would like to rule out arrhythmia." AR at 1112. Dr. Koopman wrote that she "placed [Plaintiff] off work for a week until he can return here and let me know the status with regard to the job transfer he is hoping to achieve." *Id*. Testing later confirmed that Plaintiff had no heart condition. AR at 1118.

According to a Doctor's First Report of "Occupational Injury or Illness" dated April 22, 2002, Plaintiff reported to Dr. Koopman that constant threats and harassment from his boss caused him to feel faint and nauseated, and to suffer elevated blood pressure, rapid heartbeat and sweating. AR at 1132. On April 26, 2002, Plaintiff had a follow up visit with Dr. Koopman. The notes of the visit indicate that a Worker's Compensation attorney recommended that Plaintiff return to work if he could be transferred to another department, and that Plaintiff planned to return to work the following Monday. Dr. Koopman observed that Plaintiff did not seem quite as withdrawn as on his last visit, but that he still had a "somewhat flat affect." AR at 1113. Dr. Koopman's assessment was that Plaintiff had: "1. Stress reaction with both anxiety and depressive features. 2. Hypertension in good control today. 3. History of palpitations; pending Holter results." *Id*. Dr. Koopman wrote a note for Plaintiff stating, "[Plaintiff's] anxiety and

depression, secondary to work stress, is better than when I saw him 4/19/2002, but I have advised a transfer to another department if he is to avoid further flare-ups in his symptomology." *Id*. Dr. Koopman's notes of the visit also indicate that Plaintiff "planned to go to work on Monday and see where things stand. He had talked to the person at work who had indicated there might be a job transfer available, and they said that was still pending." *Id*. Dr. Koopman's notes also indicate that Plaintiff "did express to me today the feeling that they are trying to get him to quit." *Id*.

Dr. Zweng's April 29, 2002 Assessment

On April 29, 2002, Plaintiff was seen by Dr. Dean G. Zweng at the Santa Cruz Medical Clinic, who noted the following:

> A 49-year old who has been off work due to anxiety and job stress. He feels like he needs to get back to work, although it does not feel too much better. He did meet with his employers and some changes were made to decrease his level of stress at work. On further questioning, he has had some chronic feelings of irritability and inability to make decisions, sleep disturbance, anxiety and agitation. In low mood and tearfulness. He has a bedridden daughter for four years at home and a history of depression. He has been on different anti-depressant medications in the past mainly to control his chronic pain issues of his neck and back. He was able to tolerate Paxil in the past; however, it did not help his chronic pain. He has also been on Celexa recently which caused him too much agitation, and he could not tolerate Zoloft or try a cycle of antidepressants. He also has a history of hypertension.

AR at 1116. Dr. Zweng's notes indicate that Plaintiff's current medications were: "High blood pressure medicine, Topamax, given to him by a psychiatrist for his agitation, Ambien, Aciphex and Darvocet." *Id*. Dr. Zweng's assessment was that Plaintiff had "[a]djustment reaction with anxiety and depression with probably underlying major depression." *Id*. Plaintiff decided to start taking Paxil. *Id*. Dr. Zweng advised Plaintiff to follow up with a psychiatrist, but Plaintiff was reticent to do so. *Id*. Dr. Zweng released Plaintiff "back to regular work." *Id*.

The Court finds that the visits with Drs. Koopman and Zweng summarized above indicate

Case No.: 5:10-cv-05399-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52;
GRANTING DEFENDANT'S MOTION FOR JUDGMENT UNDER FRCP 52

7

that Plaintiff was receiving care for his mental health[2] during the month of April 2002. This evidence might satisfy the first of the two requirements to establish a Disability under the Plan: "due to sickness . . . you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis." AR at 1470. However, the Court finds that the medical records from April of 2002 fail to establish the second requirement under the Plan: that during the 90 day Elimination Period and for the next 60 months period, Plaintiff was unable to earn more than 80% of his Earnings or Indexed Predisability Earnings at his Own Occupation for any employer in his Local Economy. *Id.* Neither Dr. Koopman nor Dr. Zweng opined that Plaintiff was unable to work at his Own Occupation for an employer in his Local Economy. Rather, on Friday, April 19, 2002, Dr. Koopman initially placed Plaintiff on leave for a limited duration of one week until he could return and let her know whether he was able to transfer to another position. AR at 1112. When Plaintiff returned for another visit, Koopman signed a Work Status Report form dated April 26, 2002, indicating that Plaintiff's "Work Status" was "Modified with limitations listed below" and specifying under "Work Limitations" that Plaintiff "needs to be under different manager in different dept." AR at 1115. Dr. Zweng also released Plaintiff to return to work on Monday, April 29, 2002. *Id.* at 1116. That two doctors cleared Plaintiff to return to work is inconsistent with Plaintiff's assertion that as of April 19, 2002, he was unable to work at his Own Occupation during the Elimination Period and the next 60 month period.

Dr. Mears's May 1, 2002 Assessment

On May 1, 2002, Plaintiff was seen by Dr. William C. Mears at the Santa Cruz Medical Clinic. Dr. Mears noted that Plaintiff "continues with anxiety, rapid heartbeat, unable to sleep. . . . Also increased anxiety at work. He said that he was suspended today." AR at 1119. Dr. Mears's assessment was that Plaintiff had: "1. Palpitations; work-up in progress. 1. Adjustment disorder

---

[2] There is a reference to chronic pain, however, Drs. Koopman and Zweng were not providing care and treatment to Plaintiff for his chronic pain. The reference to chronic pain is insufficient to meet the Plan requirement that Plaintiff was "receiving Appropriate Care and Treatment from a Doctor on a continuing basis." AR 1470.

with anxiety and depression related to job stressors. 3. Insomnia, possibly related to his Paxil." *Id.*

The Court concludes that Dr. Mears's notes do not support a finding of Disability within the meaning of the Plan. Instead, the notes are indicative of the same interpersonal clash with Plaintiff's supervisor that prompted Plaintiff to seek treatment with Dr. Koopman in April of 2002. AR at 1111. Dr. Mears's notes indicate that Plaintiff's anxiety and depression are related to Plaintiff's particular job. AR at 1119. There is no evidence that Plaintiff's anxiety and depression prevented him from working at a different job. To receive LTD benefits under the Plan, Plaintiff must have been unable to earn more than 80% of his Earnings at his "Own Occupation" for any employer in his Local Economy. The Plan specifies that "Own Occupation" is not limited to the specific position Plaintiff held. AR at 1471. Dr. Mears wrote that "Plaintiff can return to work but due to his job stress under one supervisor, it is recommended that he no longer work in the same department." AR at 1119. Thus, Dr. Mears's notes do not support Plaintiff's assertion that he was unable to earn an income working at his "Own Occupation" for any employer in his Local Economy.

### Dr. Koopman's May 4, 2002 Assessment

Plaintiff was seen for the third time by Dr. Koopman on May 4, 2002. The notes from this visit describe the following:

> [Plaintiff] returns today complaining of diarrhea. He is uncertain whether this is a side effect of some of the medications he has been placed on or of another etiology. Since I last saw him on 4/26, patient returned to work the following Monday which would have been 4/29. I had given a note saying he was okay to return to work as long as he was in a different department than his usual one. He reports that he was told by his Human Resources person there that that was not acceptable and that he had to go back and see the doctor and get a note saying that he was okay to go back to his usual work. Apparently, he saw Dr. Zweng here who put him on Paxil and did send him off with a note saying he was okay to return to his usual duties. He went to work the following day on 4/30 and was told he was suspended. He was having a great deal of difficulty sleeping at night and was seen the following day on Wednesday, 5/1, by Dr. Mears who suggested he take the Paxil in the a.m. and also gave him Clonazepan to take a bedtime. He was wearing the Holter monitor that had been arranged for the palpitations he has been having the

> whole of Tuesday and reports that his heart did seem like it was racing at times during then so presumably we would have caught anything that was there. He then received a letter from his employer Thursday, 5/2, saying that he had been fired. . . .

AR at 1122. Dr. Koopman's assessment was that Plaintiff suffered from anxiety/depression and diarrhea.

The Court concludes that Dr. Koopman's May 4, 2002 Assessment does not support a finding of Disability within the meaning of the Plan. Three different doctors, Drs. Koopman, Zweng and Mears, examined Plaintiff and concluded he was able to return to work in late April of 2002. Dr. Koopman later signed a Work Status Report indicating that as of May 4, 2002, Plaintiff's "Work Status" was "Unable to return to work until seen again." AR at 1124. By May 4, 2002, however, Plaintiff was no longer an Eligible Employee under the Plan due to his termination. Furthermore, Dr. Koopman restricted Plaintiff from work only "until seen again," not for a prolonged period.

Dr. Mears's May 11, 2002 Assessment

Plaintiff returned to Dr. Mears on May 11, 2002, at which time Dr. Mears noted that Plaintiff's palpitations seem to be better; that Plaintiff was suffering from diarrhea; that Plaintiff's "stress has increased"; and that he "is still feeling as anxious and depressed as he was before." AR at 1126. Dr. Mears made the following assessment: "1. Palpitations; improved on Tenormin. 2. Diarrhea, possibly secondary to the Tenormin (Atenolol) versus secondary to Blastocystis. 3. Adjustment disorder, anxiety and depression due to job stress." *Id.* Under the section titled "Work Status," Dr. Mears noted, "Plaintiff will continue his prior work status. Follow-up care on 5/22." AR at 1127.

Although the May 11, 2002 Assessment indicates that Plaintiff was receiving continuous care for an illness (stress, anxiety, depression, adjustment disorder), the Court finds that this Assessment (and the other treatment records preceding Plaintiff's termination) fail to establish that at any time prior to Plaintiff's coverage ending on May 1, 2002, Plaintiff was unable to earn 80% of his Predisability Earnings at his Own Occupation for any employer in his Local Economy.

United States District Court
Northern District of California

Dr. Abarbanel's May 2002 Notes

Included in the Administrative Record is a note by Dr. Abarbanel indicating that Plaintiff had been seen by a psychiatrist; had a panic attack when he was "yelled at" at work; and had been seen by a workers' compensation physician who put him on a range of medications. AR at 366. Dr. Abarbanel initially evaluated Plaintiff on May 15, 2002, and noted that Plaintiff had suffered from depression "on and off" for approximately two years. *Id*. Plaintiff also reported to Dr. Abarbanel that recently his condition had gotten "severe," he couldn't function, and that he was experiencing sadness, tearfulness, hopelessness, and a sleeping disorder. *Id*. Dr. Abarbanel's notes indicate that Plaintiff was taking the following medications: Atenolol, Paxil, Aciphex, Topomax and Flagyl for parasites.

Under the heading "Mental status examination," Dr. Abarbanel indicated: "Oriented x 3. Constant worry, can't sit still (metaphor). Mood down, anxiety marked, denies suicidality. Sits rather still, appearance unremarkable. Does seem to miss explanations, but not remarkably so." AR at 367. Dr. Abarbanel's "Impressions" were: "1. Dyslexia, LD. 2. ADD, RT with (+) response to Dexedrine. 3 Mood disorder, dysthemia with secondary episodes of depression. 4. Hypertension. 5. Multiple social stressors (off work, disability of daughter)." *Id*. Under "Plan", Dr. Abarbanel wrote: "1. Dexedrine- >10 mg tid Decrease Paxil -> 10 mg 2. Return in 10 days." *Id*.

Although Dr. Abarbanel's notes substantiate that Plaintiff was receiving continuous care for a "sickness" (which may be sufficient to satisfy the first requirement to establish a Disability under the Plan), the Court finds that the notes do not establish the second requirement: prior to May 1, 2002 and during the 90-day Elimination Period plus the next 60 month period, Plaintiff was unable to earn more than 80% of his Earnings at his Own Occupation for any employer in the Local Economy.

Dr. Abarbanel's notes indicate that he continued to see Plaintiff and to prescribe medication throughout 2002 and into 2003. There are notes from May 17, 2002, May 21, 2002,

United States District Court
Northern District of California

June 3, 2002, June 17, 2002, July 15, 2002, August 8, 2002, September 4, 2002, September 25, 2002, October 21, 2002, November 13, 2002, and December 6, 2002, and January 8, 2003, January 28, 2003, January 30, 2003, February 14, 2003, April 11, 2003, April 25, 2003, May 5, 2003, and June 2, 2003, at which point Plaintiff stopped taking medications. AR at 369-374. Throughout this period Plaintiff reported agitation, stress, confusion, lack of attention, distress, anxiety, nausea, diarrhea, somnolence, depression, inability to concentrate, frustration, fatigue, headaches, and migraines. Dr. Abarbanel certified Plaintiff as disabled on October 4, 2002, January 12, 2003 and April 13, 2003. AR at 707-709. By May 1, 2002, however, Plaintiff was no longer covered under the Plan. The treatment records and Dr. Abarbanel's certifications of Plaintiff's disability post-dating May 1, 2002 fail to establish Plaintiff was "Disabled" within the meaning of the Plan.

Plaintiff relies on Dr. Abarbanel's letter dated January 16, 2014, in which Dr. Abarbanel states in pertinent part:

> I have treated [Plaintiff] previously from May, 2002 through June 2003. I treated him for the psychiatric condition of Major Depressive Disorder with anxiety; I cannot render an opinion regarding his physical condition at that time except to note that he was in pain and on pain medication. Those medications, I should add, exacerbated the functional limitations caused by his psychological condition.
>
> At the time I treated him he was disabled from doing his work at Borland Software Company due to his psychological conditions. He was suffering from severe depression and anxiety due in large part to the way the management at Borland treated him. At that time, he exhibited many of the symptoms of Post-traumatic disorder from their treatment of him; those symptoms did not disappear when he found himself unemployed and unemployable. His psychological condition affected his ability to concentrate, remember important facts, and to deal with others. He would not have been able to concentrate enough to perform any occupation and could not take instruction or criticism from employers.

AR 576. The Court gives this January 16, 2014 letter minimal weight because it was prepared over ten years after Plaintiff allegedly became disabled; Dr. Abarbanel first evaluated Plaintiff on May 15, 2002, after Plaintiff's coverage ended; and the first time Dr. Abarbanel certified Plaintiff

as disabled was October 4, 2002, again, after Plaintiff's coverage under the Plan had ended.

<u>Dr. Meade's March 2003 Assessment</u>

In a March 21, 2003 Workers' Compensation Report, Dr. Michael G. Meade summarized Plaintiff's history (as told by Plaintiff) as follows. Plaintiff was hired at Ashton-Tate through a vocational rehabilitation program after a back injury. AR at 1146. Plaintiff was happy working as a systems software worker until 2000, when a new CEO was hired. *Id*. Plaintiff felt overwhelmed and his supervisor began harassing him on a daily basis, demanding that Plaintiff work faster. *Id*. When asked about non-industrial stressors, Plaintiff told Dr. Meade that he was taking care of his ill 18 year-old daughter, who had been bedridden for the past ten years. *Id*. Plaintiff told Dr. Meade that caring for his daughter was stressful, but that "the stress has been present for five years with no sign of disability proceeding from it." *Id*. Dr. Meade also noted that Plaintiff "denies other medical, relationship, family, legal and financial problems." *Id*.

Dr. Meade opined that Plaintiff was "suffering from an episode of major depression, which is of severe nature, and is characterized by serious generalized anxiety and discrete panic attacks." AR at 1155. Further, Dr. Meade opined that Plaintiff's depression "is superimposed on an underlying dysthymia, and chronic, probable lifelong Attention Deficit Hyperactivity Disorder." *Id*. Dr. Meade also stated: that "[t]here is ample medical evidence on today's examination to establish that the patient is currently temporarily totally disabled on a psychiatric basis"; that Plaintiff "is not permanent and stationary with respect to his mental illness"; and that "it is quite clear from the history and the medical records that this depression developed in response to industrially related stress, namely the harassment and threatening of the patient by his immediate supervisor, leading ultimately to the disciplinary action of May 2002, the proximate cause of his abrupt termination May 1, 2002." AR at 1155-56. Dr. Meade concluded that it was medically probable that "the stress of Plaintiff's discipline and termination" was responsible for 65% of the total stress leading to the patient's depressive illness; "the verbal harassment from [Plaintiff's] immediate supervisor" was responsible for 20%; and that Plaintiff's chronic stress in dealing with

his daughter's serious illness was responsible for the remaining 15%. AR at 1156.

The Court concludes that Dr. Meade's March 2003 Assessment does not support a finding of "Disability" under the Plan. The Assessment was completed approximately nine months after Plaintiff's coverage ended on May 1, 2002. To the extent Dr. Meade's Assessment suggests that Plaintiff's disability developed earlier and rendered him Disabled under the Plan prior to May 1, 2002, his Assessment is inconsistent with the contemporaneous opinions of Drs. Koopman, Zweng and Mears rendered in April and May of 2002.

<u>Assessments re Neck and Back Pain</u>

In August of 2003, Plaintiff was evaluated by Dr. Michael D. Butcher for multiple musculoskeletal complaints including: neck pain, upper back pain, shoulder pain, left knee pain and hip pain. Dr. Butcher determined that Plaintiff appeared to have stiffness and limited range of motion in the neck and back, and swelling in the left knee. AR at 1159. Plaintiff had MRIs taken of his spine, left and right shoulders, and left knee. AR 754-766. On August 29, 2003, Dr. Samir Sharma reported that the MRI of the cervical spine showed cervical spondylosis markedly at C5-6 with disc involvement and root involvement at the C5-6 level. On the lumbosacral MRI, Dr. Sharma saw evidence of lumbar stenosis, particularly at L4-5 and L3-4 levels. AR at 1180.

Included in the Administrative Record is a "To Whom It May Concern" letter written by Dr. Butcher dated September 17, 2003, in which Dr. Butcher opined that Plaintiff is unable to work due to multiple musculoskeletal problems, including degenerative disc disease of the neck and lower back, arthritis in the right shoulder and torn cartilage in the left knee. AR at 1193. On October 28, 2003, Dr. Butcher prepared another report in which he opined again that Plaintiff was disabled from gainful employment. AR at 1198.

There is also a letter dated November 14, 2003 from Dr. Rosemaria Gennuso to Dr. Butcher, stating that Plaintiff had "neck pain notable in all directions, worse with extension." AR at 1201. Dr. Gennuso noted, however, that although Plaintiff has had longstanding trouble with his neck, Plaintiff had no treatment for his neck for the past eighteen months. AR at 1200.

1    This series of notes and letters fail to establish that Plaintiff was "Disabled" within the

2    meaning of the Plan.  The notes and letters establish that Plaintiff was under continuous care for

3    chronic pain as of August 2003, but Plaintiff's coverage under the Plan ended May 1, 2002.  AR at

4    1487.  There is no evidence that Plaintiff was under a physician's continuous care for chronic pain

5    before May 1, 2002.

6    <u>Dr. Summa's Evaluations from 2010 and 2012</u>

7    Included in the Administrative Record are two evaluations by Dr. Chris Summa, a spinal

8    and orthopedic surgeon.  The New Patient Evaluation dated September 2, 2010 stated that Plaintiff

9    suffered a severe cycling accident approximately 20 years ago in which he fell off a cliff, and that

10   Plaintiff had back pain for many years.  AR at 807.  Plaintiff reported that his back pain worsened

11   over the last five years, and that he could not stand or sit for very long, and that his daily activities,

12   such as washing dishes and doing laundry, had become difficult.  *Id*.  Plaintiff had not had any

13   back surgeries, although he did undergo a foraminotomy of the cervical spine in 2004.  *Id*.

14   Plaintiff also reported that he had numerous nerve blocks, medications, physical therapy, traction,

15   chiropractic and acupuncture treatment.  *Id*.  Dr. Summa's medical impression was that Plaintiff

16   had a T7-T8 disc herniation with thoracic degenerative disc disease.  *Id*.

17   Plaintiff returned to Dr. Summa on May 31, 2012.  Dr. Summa reported that Plaintiff was

18   experiencing worsening difficulties with sitting and standing despite eighteen sessions of

19   "Rolfing."  AR at 810.  Dr. Summa's medical impression was that Plaintiff had L3-L4 and L4-L5

20   advanced degenerative disc disease.  *Id*.  Dr. Summa recommended fusion surgery, but Plaintiff

21   was opposed to surgery.

22   The Court finds that Dr. Summa's evaluations from 2010 and 2012 fail to establish that

23   Plaintiff was "Disabled" within the meaning of the Plan.  Although the evaluations indicate that

24   Plaintiff "had back pain for many years" and that his "back, pain worsened over the last five

25   years," there is no evidence that Plaintiff was under continuous care for chronic pain prior to May

26   1, 2002, the date Plaintiff's coverage under the Plan ended.  AR at 1487.  Dr. Summa's

27

28

evaluations also fail to establish that during the 90 day Elimination Period and for the next 60 months period, chronic pain rendered Plaintiff "unable" to earn more than 80% of his Earnings or Indexed Predisability Earnings at his Own Occupation for any employer in his Local Economy.

### 2. Independent Physician Consultants Concluded Plaintiff Was Not Disabled

Defendant retained three Independent Physician Consultants ("IPC"), Dr. Lee Becker, Dr. Sugerman and Dr. Jane St. Clair, to review Plaintiff's medical records. Each of the consultants concluded that Plaintiff was not Disabled within the meaning of the Plan.

### Assessments of IPC Dr. Lee Becker

On July 3, 2012, Defendant obtained a review from Dr. Lee Becker, a Board-certified psychiatrist. AR at 935-945. Dr. Becker summarized Plaintiff's medical records, and opined that:

> Overall, the information available to review did not support significant, global psychiatric functional limitations, along with objective findings, to preclude full-time occupational functioning from the date in question forward on an ongoing basis. This is based on a variety of factors, primarily that the information reviewed showed the issues and symptoms were primarily work-related and the various progress notes submitted did not describe a pattern of significant impairments in daily functional activities outside the workplace or a pattern of ongoing, significant mental status abnormalities, and therefore a lack of ongoing objective mental health findings supporting. The 4/19/02 medical clinician progress note showed various self reported symptoms related to workplace stressors and no detailed mental status abnormalities were noted. The 4/26/02 progress note showed flat affect as the mental status issue without other significant abnormalities, with the clinician advising the claimant to transfer to another department/manager. The 4/29/02 progress note showed no significant mental status abnormalities. The 5/1/02 progress note shows the claimant could return to work but not in the same department.

AR at 942.

Dr. Becker's IPC report was sent to Dr. Abarbanel. On September 4, 2012, Dr. Abarbanel responded that Dr. Becker's report was accurate. but provided the following additional remarks.

> First, the material he reviewed are from about ten years ago.

> Second, it is valid, I think that the Workers Compensation position that [Plaintiff's] difficulties were largely the result of the workplace

mistreatment, along with the successful prosecution of the Wrongful Discharge case (that I'd consulted for) argue that, once the abusive behavior [ ] of the company ended, [Plaintiff] might well not be as disabled vis-à-vis returning to work as in the time during and shortly after the abuse itself. I'm paraphrasing the worst case (against [Plaintiff]) scenario from the point of view of MetLife.

Third, however, it must be said that the nature of the psychiatric injuries resulting from the abusive treatment make it very likely, in my estimation, that [Plaintiff] sustained an ongoing disability. And, it makes it likely that, if he is examined currently (an examination sorely needed to make a determination about his current disability), ongoing disability will be found.

Specifically, his mood disorder (by my thinking best diagnosed as Major Depressive Disorder, Recurrent, 296.32) and his anxiety disorder (by my thinking best diagnosed as an anxiety disorder with post-traumatic features, 300.00). The former disorder is an ongoing disorder that, once exacerbated as it was, makes it much more likely for it to persist. The latter, almost by definition of the post-traumatic features tend to persist . . . .

My point, then, is that the reports establish the effects, industrially caused, the company's actions precipitated are by their nature very likely to persist. That fact, plus the fact that [Plaintiff] is now ten years older and about to turn 60, make it very likely that a significant degree of disability would be identified if he is examined currently. I would very much recommend that examination now if you intend to establish ongoing disability.

AR at 874-75. In response, on October 9, 2012, Dr. Becker prepared an addendum, stating:

The psychiatric response letter indicates no major issues with the psychiatric consultant report findings. The letter clarifies the clinician's working diagnoses, as well as describing causative factors contributing, which have been previously noted. The clinician speculates on disability status. However, no additional psychiatric clinical information was provided for review, such as additional detailed objective mental health findings, progress notes, or psychological testing and ongoing treatment by the psychiatrist was not described.

AR at 797.

Plaintiff criticizes Dr. Becker's assessments in several respects. First, Plaintiff contends that Dr. Becker is not truly an independent reviewer and his opinions are not credible because Defendant has paid Dr. Becker hundreds of thousands of dollars for disability claim reviews. The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have

an incentive to make a finding of 'not disabled' in order to save their employers['] money and preserve their won consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (citation and quotation marks omitted). The fact that the medical reviewers are compensated for their services, however, is unremarkable in and of itself. *See*, *e.g.*, *Polnicky v. Liberty Life Assurance Company of Boston*, No. 13-1478 SI, 2014 WL 969973 (N.D. Cal. 2014) (denying request for discovery re consulting physician's compensation); *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1104 (C.D. Cal. 2011) (finding evidence that "MLS performed 77 examinations for MetLife between 2009 and September 2010, for which MetLife had paid $118,816.25" not probative of bias); *Nolan v. Heald College*, 745 F. Supp. 2d 916, 923 (N.D. Cal. 2010) (concluding that statistics showing that MetLife paid NMS $236,490 in 2002, $569,795 in 2003, $838,265 in 2004, and $1,671,605 in 2005 for independent medical opinions "are not probative of bias"). Here, there is no evidence that Dr. Becker's compensation was improper, i.e. that he was paid only if he found in Defendant's favor, was paid for incomplete reviews, or his compensation was excessive by industry standards. Furthermore, the Court finds Dr. Becker's assessments credible. Indeed, Dr. Abarbanel described Becker's report as accurate.

Second, Plaintiff challenges Dr. Becker's conclusion that there was a lack of objective mental health findings, contending that the mental status examination performed by Dr. Meade constitutes objective mental health findings. This mental status examination, however, was performed by Dr. Meade on February 21, 2003 (AR at 714)—well after Plaintiff's coverage under the Plan ended on May 1, 2002.

Third, Plaintiff contends that Dr. Becker did not explain why he disagreed with Dr. Abarbanel's opinion that Plaintiff's psychiatric conditions likely persisted. To the contrary, Dr. Becker stated that Dr. Abarbanel was speculating on disability status and did not provide any additional psychiatric clinical information. That Dr. Abarbanel was speculating about Plaintiff's disability status is evident from his conclusion that "the nature of the psychiatric injuries resulting from the abusive treatment *make it very likely*" that Plaintiff sustained an ongoing disability, and

"it makes it *very likely* that a significant degree of disability *would be* identified *if he is examined currently*. I would very much recommend that examination now if you intend to establish ongoing disability." AR at 875 (emphasis added).

In short, Dr. Becker found, and this Court agrees, that Plaintiff's records fail to establish that Plaintiff's psychiatric conditions prevented Plaintiff from working at his Own Occupation before May 1, 2002.

Assessments of IPC Dr. Sugerman

After Plaintiff filed an appeal, Defendant retained Dr. Peter Sugerman, a Board-certified psychiatrist, to prepare an IPC report dated July 16, 2013. Dr. Sugerman determined that there was insufficient evidence of a psychiatric functional impairment. AR at 671. In an addendum dated January 28, 2014, Dr. Sugerman reiterated his original opinion that from the outset, Plaintiff's condition was viewed as chronic and reflective of situational factors, but not of such a severity that required intensive treatment. AR at 581-82. In another addendum dated March 14, 2014, Dr. Sugerman considered additional information submitted by Dr. Abarbanel, but concluded that the new information amounted to opinion only, without detailed, objective, global mental health data. AR at 552. On April 18, 2014, Dr. Abarbanel responded to Dr. Sugerman's addendum. Dr. Abarbanel explained that he provided several "estimated" return to work dates because he did not think Plaintiff was "permanently disabled." AR at 330. Further, Dr. Abarbanel stated, "I provided the earliest dates I thought it possible [Plaintiff] might be able to return to work. In retrospect they were wrong; they were, after all, estimates. What these dates show is that I thought [Plaintiff] was totally disabled from his job at the time I provided them." *Id*. Dr. Sugerman prepared another addendum dated August 18, 2014, in which he confirmed his prior assessment. AR at 341-346, 359-364.

Plaintiff contends that Dr. Sugerman's opinion is not credible because Defendant paid him hundreds of thousands of dollars for disability claim reviews. For the reasons discussed previously, Defendant's payments to Dr. Sugerman, without more, are insufficient to discredit his

medical opinions.  Plaintiff also points out that at least two different district courts have faulted his opinions.  S*ee Westfall v. Liberty Life Assurance Co.*, No. 16-2921, 2018 WL 1122134 (N.D. Ohio Feb. 28, 2018) (faulting Dr. Sugerman for "cherry-picking" symptoms and reverse engineering a diagnosis); *Weisner v. Liberty Life Assurance Co.*, 192 F. Supp. 3d 601, 619 n. 15 (D. Md. 2016) (faulting Dr. Sugerman's conclusion that impairment related to marijuana use was a matter of the claimant's choice rather than an illness that cannot be controlled).  Here, there is no evidence that Dr. Sugerman engaged in any cherry-picking or reverse engineering.  Nor does this case present any issues about volitional or addictive drug use.  Rather, this case presents a dispute over the severity of Plaintiff's documented psychiatric conditions.  The criticisms of Dr. Sugerman's opinions in *Westfall* and *Weisner* are of no moment.

Next, Plaintiff criticizes Dr. Sugerman's report for excluding "the concept of psychological injury due to a work situation."  AR at 604.  The criticism is unfounded.  Dr. Sugerman explained that this topic "was probably addressed by those who helped the claimant pursue worker's compensation and is not germane to this report, which addresses evidence of impairment due to a psychiatric illness."  *Id*.  Dr. Sugerman did not include, and was not asked to include, an analysis of whether Plaintiff suffered an on-the-job injury for purposes of worker's compensation.  AR at 546.

Plaintiff also takes issue with Dr. Sugerman's opinion that "stress it not an illness.  It is a condition of life.  Responses to stress are therefore not considered symptoms of illness unless it can be demonstrated that the claimant's psychological condition developed into a psychiatric illness."  AR at 604.  Plaintiff argues that his stress did, in fact, develop into multiple diagnostic psychiatric illnesses, as reflected in Drs. Zweng, Koopman, Abarbanel, Padgitt and Meade's records.  In the Court's view, Dr. Sugerman did not completely reject the various diagnoses of psychiatric illnesses.[3]  Instead, Dr. Sugerman explained that the documented symptoms associated

---

[3] Dr. Sugerman disputed Dr. Padgitt's diagnosis that Plaintiff suffered from PTSD from environmental stress.  AR 604-605.  Dr. Sugerman stated that this "concept is not supported by the DSM-IV version of PTSD."  *Id*.

with Plaintiff's illnesses (a) did not support a "severe psychiatric condition that would require psychiatric limitations or restrictions," (b) were "reflective of situational factors," (c) were "not of such severity that intensive care was required," and (d) were not linked to a decline in global functional difficulties. AR 604. The Court agrees with Dr. Sugerman's assessment of the medical records. Furthermore, the most reliable evidence of Plaintiff's condition while Plaintiff was covered by the Plan are from the contemporaneous reports of Drs. Koopman, Zweng and Mears, all of whom cleared Plaintiff to return to work.

<u>Assessments of IPC Dr. Jane St. Clair</u>

On August 2, 2013, Dr. Jane St. Clair prepared an IPC report. Dr. St. Clair, who is Board-certified in Occupational Medicine, focused her review on Plaintiff's alleged shoulder, knee and spinal impairments. Dr. St. Clair concluded that there was no documentation to show that Plaintiff's musculoskeletal complaints existed with such severity as to cause restrictions and limitations on April 19, 2002. AR at 675-683.

After speaking to Plaintiff's physician, Dr. Resneck-Sannes, Dr. St. Clair prepared an addendum dated August 25, 2013. AR at 655-656. According to the addendum, Dr. Resneck-Sannes told Dr. Clair that Plaintiff had had various musculoskeletal complaints for as long as he had known Plaintiff, and confirmed that he did not have any records for April through December of 2002. AR at 656. Plaintiff was seen by Dr. Resneck-Sannes on February 5, 2002, and again on June 23, 2003: there are no records of Plaintiff having been seen by Dr. Resneck-Sannes between February 2002 and June 2003. AR at 656. Dr. St. Clair prepared additional addendums dated January 28, 2014 (AR at 592-93), March 22, 2014 (AR at 564-567), and June 29, 2014 (AR at 390-92). In her addendum dated June 29, 2014, Dr. St. Clair stated:

> [Plaintiff] had residual physical abilities in spite of the chronic daily pain he experienced. My interpretation of the situation (from review of the documentation) was that he desired to continue to work, was released to work in another department, and when this was not allowed, he was terminated. [Plaintiff] had the capacity to work in a

United States District Court
Northern District of California

> similar position in a less stressful setting, most likely at another company. Without a new job and with no opportunity to work at Borland, his work opportunities were limited, but his ability to work remained physically intact.

AR at 353.

Although Plaintiff disputes Dr. St. Clair's ultimate conclusion, Plaintiff relies on Dr. St. Clair's characterization of medical records as showing "the *chronicity of the problems* with [Plaintiff's] upper back and spine and with several of his joints." AR at 622 (emphasis in original). In particular, Plaintiff relies on Dr. St. Clair's citations to Dr. Gennuso's records dated November 14, 2003, Dr. Blumefeld's records dated May 29, 2004, and Dr. Schiffer's records dated June 9, 2004. These records and the vast majority of other records cited by Dr. St Clair are dated well after Plaintiff's coverage ended on May 1, 2002, and therefore do not support a finding of Disability within the meaning of the Plan.

There is only one documented doctor's visit for pain in 2002. On March 7, 2002, Plaintiff was seen by Dr. Ching for left buttock sensations and shoulder pain. AR at 622, 1106-1109. Plaintiff described the sensation as intermittent "swishing vibration" or "throbbing" in the buttock, but "not exactly painful." AR at 1106. Plaintiff described his left shoulder pain as "chronic" and "intermittent." *Id.* Under the heading "Physical Examination," Dr. Ching noted: "[s]houlder examination demonstrates internal rotation of 70 degrees, bilaterally, with increased discomfort in the left shoulder. . . . Impingement testing, left shoulder, causes pain particularly Neer test. . . .Supraspinatus test causes increased pain in the left shoulder." AR at 1107. Dr. Ching also examined Plaintiff's back and noted: "patient demonstrates no abnormal posturing or guarding of the lower back. Lumbar range of motion is intact in all orientations including flexion, extension and lateral side bending. There is no pain with range of motion. . . . Palpitation demonstrates no focal areas of tenderness in the lumbosacral paraspinals or midline. The patient has no percussive tenderness over the spine. No tenderness is noted over the sacroiliac joints or lilac crest bilaterally." AR at 1107-1108. Under the heading "Impressions," Dr. Ching noted: "1. Intermittent left buttock sensations of indeterminate origin. . . 2. Left rotator cuff tendinitis with

impingement." AR at 1108. Dr. Ching recommended localized deep tissue treatment including massage and modalities for his left buttock and recommended therapeutic exercises for the shoulder. *Id.* This one doctor's visit in March of 2002 is insufficient to establish the requirement under the Plan that "due to sickness . . . or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis." AR at 1470. Furthermore, there is no evidence that the buttock sensation and left rotator cuff tendinitis with impingement persisted with such severity to prevent Plaintiff from working at his Own Occupation, even taking into consideration Plaintiff's other medication conditions.

Despite the absence of medical treatment for physical illnesses from 2002, Plaintiff points to the opinion of Plaintiff's physician, Dr. David Resneck-Sannes, as evidence of disabling pain. AR at 769. In 2009, Dr. Resneck-Sannes opined that in February of 2002, Plaintiff suffered from disabling back pain for degenerative disc disease, chronic migraine headaches and failed knee and shoulder surgery. Plaintiff also relies on a letter dated January 22, 2014 in which Dr. Resneck-Sannes stated:

> During the time of 2002-2004 he was seen 13 times in my office. During that time he had treatment such as shoulder injections and medication renewals. The pain medications prescribed were for his neck, back and joint pains requiring various combinations of anti-inflammatory and narcotic preparations. Several of these medications are known to affect cognition and impeded focus.
>
> These conditions, and the pain medications he took because of them, made it hard for [Plaintiff] to work. In 2002 [Plaintiff's] ability to sit still and work at a desk would be limited because of his back problems. Furthermore, his ability to concentrate would have been impeded due to his constant chronic pain and the pain medications he was taking, which are known to affect cognition and focus. In 2002, [Plaintiff] was unable to work a full time sedentary job, especially one that required a lot of focus and concentration. Any other problems [Plaintiff] suffered from would have only exacerbated his disabling condition.

AR at 574. Dr. Resneck-Sannes prepared another letter dated May 15, 2014 in which he stated that he had treated Plaintiff for back pain for over twelve years and that Plaintiff's back pain was severe enough to prevent him from working. AR at 399.

Dr. Jane St. Clair, however, reviewed Plaintiff's medical records at least twice in search of evidence of treatment for pain management, and noted that Dr. Resneck-Sannes saw Plaintiff on February 5, 2002, and then not again until June 23, 2003. AR at 656. In an addendum, Dr. Jane St. Clair concluded:

> There is no question that [Plaintiff] had musculoskeletal issues that cause chronic pain in multiple areas, starting back many *years prior to the workplace[] changes* in 2002. He had managed them well with minimal medications for years; other than one reference to MS Contin and OxyContin (Resneck-Sannes, 1/8/05), most of the medications lists include only propoxyphene. This use of minimal medication is perhaps how he was able to perform well as a senior programmer at Borland for so many years. The changes in the workplace were a source of new stress for him. Decreased coping abilities for increasing stressors can cause the perception of increased pain at levels that were previously manageable.
>
> This reviewer believes that his attention to his workplace issues and their psychological effects . . . made it more difficult to seek medical attention for the chronic pain issues. While he sought psychological help and medications to deal with his increasing anxiety, depression, low mood, he failed to focus on the physiological symptoms: neck pain, shoulder pain, and low back pain.

AR at 389, 504 (italics in original). Thus, Dr. St. Clair repeatedly acknowledged that Plaintiff suffered from chronic pain. But, the Plan requires Plaintiff to prove that while he was eligible for benefits (i.e. prior to May 1, 2002), he was "receiving Appropriate Care and Treatment from a Doctor on a continuing basis" for any sickness or injury. The records fail to establish this. There is no evidence of treatment by Dr. Resneck-Sannes between February 5, 2002 and June 23, 2003. AR at 656.

### 3. Plaintiff's Other Evidence of Alleged Disability

To substantiate his claim of disability, Plaintiff also relies on the opinion of Dr. Steven Padgitt dated December 9, 2002, which stated:

> This is to verify that I have begun a course of treatment with [Plaintiff]. The patient reports a long-standing history of attention/concentration (Attention Deficit Disorder) problems. It is also clear from his historical report that he suffers from Post Traumatic Stress Disorder, an anxiety disorder resulting from environmental stress/trauma. The PTSD symptoms are exacerbating

> his attention and concentration difficulties. This disorder appears
> related to his work conditions under the employ of Borland Software
> Corporation.
>
> He was assessed using Quantitative EEG technology and showed
> abnormalities when compared to his asymptomatic peers. We are
> treating predominantly with a course of EEG Biofeedback.

AR at 713. Plaintiff also relies Dr. Michael Meade's March 21, 2003 report stating that Plaintiff was temporarily totally disabled on a psychiatric basis. AR at 1155. These diagnoses alone, however, do not necessarily establish eligibility for benefits. *See, e.g. Jordan, supra; Martin v. Continental Cas. Co.*, 96 F. Supp. 2d 983, 994 (N.D. Cal. 2000); *Hoskins v. Bayer Corp. and Business Serv. Long Term Disability Plan*, 564 F. Supp. 2d 1097, 1107 (N.D. Cal. 2008). Furthermore, Drs. Padgitt and Meade's diagnoses are dated well after Plaintiff's coverage under the Plan ended on May 1, 2002.

## V. CONCLUSION

Plaintiff has not met his burden to prove that while he was covered by the Plan (that is, before May 1, 2002), he became Disabled within the meaning of the Plan such that he was unable to perform his Own Occupation. Defendant's motion for judgment is GRANTED, and Plaintiff's motion for judgment is DENIED.

**IT IS SO ORDERED.**

Dated: November 6, 2019

_____
EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California